**BUCHHEIT**

v.

**YOUNGSTOWN STATE UNIVERSITY.**

Court of Claims of Ohio.

Decided June 14, 1996.

*James S. Gentile* and *Mary Jane Stephens,* for plaintiff.

*Betty D. Montgomery,* Attorney General, *Peggy W. Corn* and *Rosa P. Wright,* Assistant Attorneys General, for defendant.

FRED J. SHOEMAKER, Judge.

The case came on for trial on April 29, 1996, on the sole issue of liability. After completion of the evidence and arguments, the matter was submitted for decision.

Prior to trial, plaintiff Julie Buchheit, now married and known as Julie Hudson, filed a motion *in limine* for an order limiting the use of polygraph testimony. However, plaintiff did not pursue the motion after receiving a copy of *Criss v. Springfield Twp.* (1990), 56 Ohio St.3d 82, 564 N.E.2d 440, wherein the syllabus states:

"Where polygraph examinations are conducted as part of a police investigation prior to the investigation of criminal proceedings, such evidence is admissible at trial to show the state of mind of police officers who are defending against a claim of malicious prosecution. This is an exception to the general rule that polygraph evidence is not admissible without a stipulation between the parties. (*State v. Souel* [1978], 53 Ohio St.2d 123, 7 O.O.3d 207, 372 N.E.2d 1318, and *Brown v. Best Products Co.* [*Inc.*] [1985], 18 Ohio St.3d 32, 18 OBR 69, 479 N.E.2d 852, distinguished.)"

Plaintiff was a nineteen-year-old freshman at Youngstown State University ("YSU"). She commuted from her home, which was approximately forty miles from YSU. At about 9:08 p.m. on April 21, 1993, plaintiff telephoned the YSU Police Department and stated that she had just been raped. Plaintiff was taken to the YSU Police Department for a brief interview with YSU Police Officer Rosemary Marsco before being transported to St. Elizabeth Medical Center Emergency Room. Officer Marsco had training and experience in the handling of rape victims.

Plaintiff told Officer Marsco that she had parked her vehicle in the M–24 parking lot and was walking to Maag Library. After crossing 5th Avenue, she was grabbed by a male black subject from her left side. He put his arm around her waist and shoved her into the ivy bush area by the southwest corner of the Jambar Office. He then laid her on the ground and, with his right arm around her neck, removed her pants and underpants with his free hand. Plaintiff struggled and was lying on her back. She was slightly penetrated and her attacker said, "You know you want it bitch!" He then struck plaintiff in her mouth, causing a small laceration to her lip. She said she kneed her attacker in the groin area, after which he fled the scene.

The emergency room physician, Dr. Maxfield, Officer Marsco, Family Services Counselor Lynn Hart, and plaintiff's father all spoke with plaintiff at the hospital and advised her to proceed with a rape kit examination. However, plaintiff refused the rape kit examination without offering an explanation, even though she acknowledged that it was the right thing to do. Plaintiff was advised that it

would be very helpful in prosecuting her offender, but she would not change her mind. Plaintiff was further advised that no one could force her to proceed with the examination against her will.

Catherine A. Engartner was an emergency room nurse at St. Elizabeth's Hospital. She testified that plaintiff was very calm and, after a brief explanation, she requested that plaintiff take the ten-step rape kit examination. However, plaintiff refused and stated, "Nothing happened, he never touched me."

Plaintiff testified that she did not take the rape kit examination because she was menstruating. She understood that it would be helpful in convicting her attacker and probably most, if not all, of the necessary examinations could have been completed even if she were menstruating. Under these circumstances, it was very unusual for a rape victim to refuse a rape kit examination.

The YSU Police Department searched for clues without success. Plaintiff reviewed numerous mug shots without identifying her assailant. The chief of police and the lieutenant in charge of the investigation had doubts about the truth of plaintiff's story for the following reasons:

1. Plaintiff drove forty miles to the library and arrived after 9:00 p.m., knowing that it closed at 10:00 p.m. She had classes on campus the following day. She parked her vehicle at a parking garage relatively far from the library when free parking was available next to the library;

2. The police department had two officers in the immediate area of the stairs where plaintiff was allegedly grabbed and raped. They reported that they never saw or heard anything unusual;

3. The area where the alleged rape occurred was immediately secured and the police could not find any evidence of a struggle or anyone lying on the ground. An examination of the back of the t-shirt plaintiff was wearing at the time of the assault did not match with soil samples taken from the area where plaintiff alleges she was assaulted;

4. Plaintiff refused a rape kit examination, which would have helped the police department in its attempt to arrest and convict the assailant.

Later, the YSU chief of police and the lieutenant in charge of the investigation asked plaintiff to take a polygraph examination. They had previously discussed this matter with plaintiff's father. Plaintiff agreed to take a polygraph examination, but not with anyone connected with the Youngstown Police Department. It was agreed that an F.B.I. agent would conduct the polygraph examination on April 28, 1993, at 1:00 p.m.

Prior to taking the polygraph examination, plaintiff was advised of her constitutional rights, which included her acknowledgment that she was voluntarily

submitting to the examination and that she understood that she could terminate the interview at any time. Plaintiff, at the request of the agent, wrote out the following statement regarding the alleged rape:

"On April 21, 1993, at approximately 9:00 p.m., I was attacked by a black male. This person's unknown to me. The attack took place on the Youngstown State Campus, as I was going to the library. He forced me into the bushes, pulled my pants down, and, to a slight extent, penetrated me. At some point, he called me a 'bitch' [*sic* ]."

After taking the polygraph examination, the operator told plaintiff that she had failed the test. Thereafter, plaintiff signed the following written statement:

"April 28, 1993

"Youngstown, Ohio

"I would like to clarify my original statement to the police. There was an incident on the evening of April 21, 1993, on the Youngstown State Campus. I know the individual involved. It was more of a molestation than rape. I think he regrets it and I don't want to press charges against him.

"S/Julie Buchheit

"Witnessed S/Leonard J. Michaud, Special

"Agent, F.B.I., Cleveland, Ohio."

The F.B.I. agent advised YSU Police Department personnel that plaintiff had failed the polygraph examination and gave them a copy of her statement.

YSU officials decided they should file a complaint and issue a press release. The following morning, prior to filing the complaint, YSU officials had a conference with the assistant prosecutor who reviewed the evidence and the complaint and prepared the arrest warrant. However, the assistant prosecutor recommended that defendant hold a press conference rather than issue a press release. YSU followed the prosecutor's advice.

The complaint charging plaintiff with falsification was filed and the criminal prosecution was terminated in favor of plaintiff. The state of Ohio failed to prove plaintiff's guilt beyond a reasonable doubt.

Plaintiff later filed her complaint alleging the following causes of action against defendant:

1. False arrest and imprisonment;

2. Malicious prosecution;

3. Defamation;

4. Invasion of privacy and intentional and/or negligent infliction of emotional distress.

 Plaintiff's principal claim is for malicious prosecution. The elements of malicious prosecution which plaintiff must prove by a preponderance of the evidence are (1) malice in instituting or continuing a criminal prosecution; (2) lack of probable cause; and (3) termination of the prosecution in favor of the defendant (here plaintiff). *Trussell v. Gen. Motors Corp.* (1990), 53 Ohio St.3d 142, 559 N.E.2d 732.

In *Huber v. O'Neill* (1981), 66 Ohio St.2d 28, 20 O.O.3d 17, 419 N.E.2d 10, the Supreme Court of Ohio cited *Ash v. Marlow* (1851), 20 Ohio 119, paragraph one of the syllabus, which defined "probable cause":

" 'A reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves, to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged,' is [a] good definition of the term 'probable cause.' "

Based on the totality of the evidence, the court finds that defendant acted reasonably, without malice, and had probable cause to believe that plaintiff was guilty of the crime of "falsification."

After the complaint was filed, it became a public record; therefore, defendant had a right to hold a press conference. *Carlton v. Davisson* (1995), 104 Ohio App.3d 636, 662 N.E.2d 1112.

 As to plaintiff's false arrest and imprisonment claim, the court finds, based on the totality of the evidence, that a proper complaint was filed and a legal arrest warrant was issued and served on plaintiff. An arrest is unlawful if it is made without probable cause or by a person unauthorized to make an arrest. This court has determined that defendant had probable cause to file the complaint. The court further finds that this claim is without merit.

Furthermore, plaintiff has failed to prove, by a preponderance of the evidence, her allegations of defamation, invasion of privacy, and intentional and/or negligent infliction of emotional distress.

Judgment will be rendered in favor of defendant and against plaintiff.

*Judgment for defendant.*