OPINION
{¶ 1} Defendant-appellant James Tietge appeals from his conviction and sentence for Domestic Violence, following a bench trial. Tietge contends that his conviction is not supported by the evidence, and is against the manifest weight of the evidence. He also contends that his trial counsel was ineffective for having failed to negotiate with the prosecutor for the admission of a successful polygraph examination, and for having failed to cross-examine the complaining witness concerning her alleged criminal record.
 {¶ 2} The record of the trial fails to portray that the complaining witness had a criminal record. The record of the trial also fails to portray the existence of a polygraph examination, much less that trial counsel failed to negotiate with the State for the waiver of objection to the admission of the results of the polygraph examination. There is evidence in the record to support the conviction, in the form of the complaining witness's testimony, partially corroborated by photographs taken of her shortly after the alleged offense. We conclude that the conviction is not against the manifest weight of the evidence. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} Tietge and his wife, Melissa, who had been married about a year, separated in late August, 2003. Tietge moved out of the marital residence, which he had owned prior to the marriage. Tietge and his wife agreed, in principle, to a dissolution of their marriage, which included a provision that Tietge would leave his wife alone in the house, and that, two weeks after the dissolution papers were signed, she would pack up and move out of the residence. Tietge signed the dissolution papers, but his wife refused to do so until he gave her his oral assurance that he would leave her alone for the two-week period she had to move out.
 {¶ 4} The incident giving rise to this conviction occurred on October 14, 2003. Up until immediately prior to the alleged violent act, the accounts of Tietge and his wife, Melissa, differ only slightly, in that she recalls an earlier discussion they had on telephone that day, which he denies. In any event, it is undisputed that at about 3:00 that afternoon, the mail was delivered to the residence, and Tietge received two registered or certified pieces of mail, as well as one regular piece of mail. Melissa Tietge signed for the registered or certified pieces of mail, on her husband's behalf. Mrs. Tietge was concerned that she might not be able to establish, later, that she had forwarded the mail to her husband, so she sought the advice of the postal authorities. They suggested that she either deliver the pieces of mail to her husband's attorney, or to her husband directly, but that, in either event, she should get a receipt.
 {¶ 5} Mrs. Tietge called her husband, on his cell phone, to discuss the mail. He did not answer, so she left a message on his voice mail. Later that afternoon, he returned her call, and agreed to come to the house to pick up the mail and give her a receipt. A little after 5:00, Tietge arrived. Tietge executed a receipt at the residence, but Mrs. Tietge noted that it did not reflect that the mail was registered (or certified, both of these terms were used in the testimony), and that it was not dated. Tietge was "a little agitated" about this request, but complied. Mrs. Tietge then gave him his mail.
 {¶ 6} There was then some amiable conversation. Tietge showed his wife the badge he had received that day as a new deputy in the Montgomery County Sheriff's Department. He had been a Camden police officer. His wife asked him if he had shown the badge to his father yet, because she knew his father would be proud of him. The conversation then turned to the dissolution papers, and by both accounts, things took a turn for the worse.
 {¶ 7} Both accounts agree that Tietge wanted his wife to go ahead and sign the papers, but his wife wanted him to promise her that he would leave her alone for the two weeks she would then have to pack up and move out. Both accounts agree that this was, at best, a sore subject. According to Tietge, he was on his way out the door at this point when he told her: "Fuck it. I'm not gon- — don't worry about it, the Dissolution papers, they're not gonna be there in the morning. I'm goin' up and I'm filing for divorce. Don't even worry about — I'm tir- — I'm not arguin' with ya' no more. There's gonna be no more discussion about it. I'm just gonna file for divorce." Whereupon Tietge left. By his account, he never approached his wife by nearer than the distance required to exchange the receipt and the mail and give her the badge and retrieve it. He also testified that his wife was in a Lazy Boy chair the entire time he was in the house.
 {¶ 8} Mrs. Tietge described the culmination of the argument about the signing of the dissolution papers as follows:
 {¶ 9} "A. No. Uh . . . James started yellin'; we ended up gettin' into it. He grabbed me, shoved me into the couch.
 {¶ 10} "* * *
 {¶ 11} "Q. All right. And you — you allege that, uh . . . — that your husband grabbed you where?
 {¶ 12} "A. The — my shirt. Just — I had a tee-shirt and a pair of sweats on.
 {¶ 13} "Q. All right. And did what? He did what then?
 {¶ 14} "A. Excuse me?
 {¶ 15} "Q. He grabbed you by the tee-shirt and did what?
 {¶ 16} "A. Uh . . . slung me around a little bit. James, uh . . . yelling, grabbed my — my shirt, slung me around. Tossed me down into the couch. Uh . . . had his forearm just pushing me — pressing me down into the couch, the corner of the couch.
 {¶ 17} "Uh . . . and yelling and cussing and ranting and raving the way he usually does.
 {¶ 18} "* * *
 {¶ 19} "Q. As a result of being forced onto the couch, uh . . . did you suffer any injuries?
 {¶ 20} "A. Uh . . . a busted eye, uh . . .
 {¶ 21} "Q. Sorry?
 {¶ 22} "A. A busted eye.
 {¶ 23} "Q. What do you mean by a busted eye?
 {¶ 24} "A. Uh . . . it had blacked the whole — all the way around from . . .
 {¶ 25} "Q. Do you know . . .
 {¶ 26} "A. . . . here to . . .
 {¶ 27} "Q. . . . that occurred?
 {¶ 28} "A. . . . all the way around.
 {¶ 29} "From his elbow striking. I had scratches across my chest from where he grabbed the shirt. The shirt was stretched out. Uh . . .
 {¶ 30} "Q. Could you describe for us how it is that you came to have a black eye and how you were struck?
 {¶ 31} "A. Well, James had me shoved down with his forearm into the couch, yelling and cussing and having a fit. Uh . . . when he came up, his elbow hit on the eye. And . . .
 {¶ 32} "Q. Did that cause you pain or discomfort?
 {¶ 33} "A. Excuse me?
 {¶ 34} "Q. Did that cause you pain or discomfort to your eye?
 {¶ 35} "A. Absolutely. It was sore. It swelled."
 {¶ 36} Mrs. Tietge did not seek medical treatment, and there is no evidence in the record that her injuries are permanent. She also testified that scratches to her chest, which she attributed to her husband's having grabbed her by the shirt and having slung her around, caused her pain or discomfort.
 {¶ 37} Mrs. Tietge testified that the whole incident, from when her husband came in the door to when he left, was no more than ten minutes in duration. After briefly debating with herself whether to call the police, she did so.
 {¶ 38} Perry Township police detective Paul Hudsonpillar responded. He was dispatched at 6:20 that evening, arrived at 6:31, and left at 7:50. The story Mrs. Tietge told him was consistent with her trial testimony. Hudsonpillar took pictures of her injuries on his digital camera. Prints of these photographs were received in evidence at the trial.
 {¶ 39} Later that evening, Tietge, who had been alerted by a friend that a police car had been seen in front of his house, made contact with Hudsonpillar, made a statement over the phone, and agreed to come in. Tietge gave Hudsonpillar his version of events. When he saw the scratches on one photograph, Tietge asked Hudsonpillar to take a photograph of his fingers, showing that his fingernails were short, with no exposed edge capable of making a scratch. Hudsonpillar obliged. These photographs were received in evidence as a defense exhibit.
 {¶ 40} Mrs. Tietge had been requested to come see Hudsonpillar the following day, for further investigation and further photographs. She cancelled the appointment. She testified that she wanted assurance that her husband would not be present, and was only willing to trust the assurance of Hudsonpillar, who was not able to talk to her. She had her daughter take pictures of her face on October 18, 2003, four days after the incident. The State offered these in evidence at trial, but the trial court sustained Tietge's objection and refused to admit them.
 {¶ 41} Tietge was arrested and charged with Domestic Violence. Following a bench trial, he was found guilty. A judgment of conviction was entered, and Tietge was sentenced accordingly. From his conviction and sentence, Tietge appeals.
 {¶ 42} Tietge has also appealed from the denial of his motion for a new trial. That appeal has been separately docketed as Case No. 20986, and is the subject of another opinion and judgment. Finally, we should note that the videotape transcript in the record appears to consist solely of the first day of trial — February 11, 2004 — and does not include the second day of trial — March 24, 2004. Nevertheless, Tietge has supplied us with a written transcript that includes the complete proceedings from both days, which we have reviewed, and there does not appear to be any dispute concerning the accuracy of the written transcript.
 II {¶ 43} Tietge's First Assignment of Error is as follows:
 {¶ 44} "APPELLANT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS GUARANTEED BY THE SIXTH ANDFOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION TEN OF THE CONSTITUTION OF THE STATE OF OHIO."
 {¶ 45} In support of this assignment of error, Tietge asserts that his trial counsel was ineffective "[b]ecause [he] failed to negotiate with the prosecutor to introduce the results of Appellant's successful polygraph test and further failed to cross-examine Melissa Tietge regarding her criminal record." We find nothing in the record to support the factual predicates for this argument.
 {¶ 46} There is nothing in the record of the proceedings to reflect the existence of a polygraph examination. Nor is there anything in the record to suggest that Tietge's trial counsel, assuming that a successful polygraph examination exists, failed to attempt to obtain the State's waiver to an objection to its admissibility. As the State notes in its brief, the results of polygraph examinations are inadmissible because they are deemed to lack sufficient reliability. They can only be admitted in evidence upon the stipulation of the parties. State v. Souel
(1978), 53 Ohio St.2d 123. There is nothing in this record to reflect that Tietge's trial counsel failed to negotiate with the State concerning a possible stipulation to admit the results of a successful polygraph examination, assuming one existed, or that the State would have agreed to a stipulation on any terms that might have been acceptable to Tietge.
 {¶ 47} There is also nothing in this record to reflect that Melissa Tietge had a criminal record that might have been a proper subject of cross-examination under Evid. R. 609.
 {¶ 48} We should note that both of these issues are raised also in connection with Tietge's appeal from the denial of his motion for a new trial. We deal with those issues in that connection in Case No. 20986.
 {¶ 49} Tietge's First Assignment of Error is overruled.
 III {¶ 50} Tietge's Second and Third assignments of error are as follows:
 {¶ 51} "APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 52} "APPELLANT WAS DENIED DUE PROCESS OF LAW GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION BECAUSE THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO ESTABLISH EACH AND EVERY ELEMENT OF THE OFFENSE BEYOND A REASONABLE DOUBT."
 {¶ 53} In evaluating the sufficiency of evidence, the subject of Tietge's Third Assignment of Error, the test is whether there is evidence in the record that, if believed, could convince the average mind of defendant's guilt beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St.3d 259, second paragraph of syllabus.
 {¶ 54} Tietge was charged with Domestic Violence, in violation of R.C. 2919.25(A), which provides as follows: "No person shall knowingly cause or attempt to cause physical harm to a family or household member."
 {¶ 55} "A person acts knowingly, regardless of his purpose, when he is aware that his{¶ 56} conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).
 {¶ 57} In our view, the testimony of Melissa Tietge, if believed, could convince the average mind, beyond reasonable doubt, that Tietge is guilty of Domestic Violence. There is no question that she was a family member at the time of the offense — she was Tietge's spouse. "`Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). The injury to Mrs. Tietge's eye clearly meets this definition.
 {¶ 58} Finally, if the injury received by Mrs. Tietge occurred in the manner she described, a reasonable person could conclude, beyond reasonable doubt, that Tietge was aware that his conduct in slinging her bodily around the room, throwing her down on the couch, and pinning her down with his forearm, in a forceful and violent manner, as she described in her testimony, would be likely to cause her physical harm. The elbow blow to her eye was not a freakish accident, but a natural and probable outcome of the violence used in assaulting her.
 {¶ 59} Tietge's Third Assignment of Error is overruled.
 {¶ 60} Tietge's Second Assignment of Error is addressed to the weight of the evidence. Here, he attacks the trial judge's conclusion that Mrs. Tietge was the more credible witness. In its verdict, the trial court recognized that its decision required it to determine which witness to believe:
 {¶ 61} "The evidence available to the court in this case boils down to this. The alleged victim reported this incident to the police close in time to the incident in question. The injuries to the alleged victim were consistent with her version of what happened. The pictures taken by the officer corroborated the alleged victim's story. The Defendant's own testimony confirms a confrontation and that he was angry with the alleged victim. The Defendant's allegation of self inflicted injuries are not supported by any other evidence."
 {¶ 62} In order to reverse a conviction as being against the manifest weight of the evidence, we must conclude, based on a review of the entire record, weighing the evidence and all reasonable inferences, that the finder of fact "lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins (1997), 78 Ohio St.3d 380. We are not prepared to so hold. Besides Tietge's own testimony, the only evidence having any tendency to contradict Mrs. Tietge's testimony is the photograph of Tietge's fingernails. Besides the obvious possibility that Tietge may have clipped his nails in preparation for turning himself in, the scratches to Mrs. Tietge's chest were slight. In the photographs, they appear as pink abrasions; it does not appear that they drew blood. If Tietge grabbed her tee-shirt and slung her around violently, as she described, it would not necessarily have required fingernails to have caused these abrasions. Tietge's fingers alone, causing the cotton fabric of the tee-shirt to scrape against Mrs. Tietge's chest, could have caused the abrasions.
 {¶ 63} Tietge's Second Assignment of Error is overruled.
 IV {¶ 64} All of Tietge's assignments of error having been overruled, the judgment of the trial court is Affirmed.
Wolff and Donovan, JJ., concur.