DECISION AND JOURNAL ENTRY
{¶ 1} The juvenile, J.F., appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, which adjudicated him delinquent. This Court affirms.
 I. {¶ 2} On May 13, 2008, complaints were filed, charging J.F. with one count of rape in violation of R.C. 2907.02, a felony of the first degree if committed by an adult; and one count of felonious assault in violation of R.C. 2903.11, a felony of the second degree if committed by an adult. The juvenile denied the charges.
 {¶ 3} On June 6, 2008, the State filed a motion to relinquish jurisdiction and transfer the juvenile for prosecution as an adult. On June 24, 2008, the juvenile stipulated to a finding of probable cause and the matter was scheduled for an amenability hearing. On August 13, 2008, the juvenile court implicitly found J.F. to be amenable to treatment within the juvenile system *Page 2 
and denied the State's motion to relinquish jurisdiction. The matter was subsequently scheduled for adjudication on October 2, 2008.
 {¶ 4} On September 23, 2008, J.F. filed a motion to admit the results of a polygraph test to which he had submitted, as well as the testimony of the polygrapher who conducted the test. The State filed both a response in opposition to and a motion to strike the juvenile's motion. Immediately prior to the adjudicatory hearing, the juvenile court heard oral arguments on the motion to admit the polygraph. The juvenile court orally denied the juvenile's motion and the matter proceeded to adjudication.
 {¶ 5} On October 6, 2008, the juvenile court adjudicated J.F. delinquent by reason of rape and felonious assault and noted that it had denied the juvenile's motion to admit the results of a polygraph test "prior to trial." At a hearing on October 23, 2008, the juvenile court classified J.F. as a Tier III sex offender and committed him to the custody of the Ohio Department of Youth Services for a minimum term of one year, maximum to the age of twenty-one. J.F. timely appeals, setting forth three assignments of error for review. This Court rearranges and consolidates some assignments of error to facilitate review.
 II. ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION AND VIOLATED THE [JUVENILE'S] DUE PROCESS RIGHTS IN REFUSING TO ADMIT THE POLYGRAPH EXAMINATION."
 {¶ 6} J.F. argues that the trial court erred by refusing to admit the results of his polygraph examination. This Court disagrees.
 {¶ 7} This Court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. State v. Arnott, 9th Dist. No. 21989, 2005-Ohio-3, at ¶ 35. An abuse of *Page 3 
discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. An abuse of discretion demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619, 621. When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. Id.
 {¶ 8} The juvenile relied on State v. Sharma (2007),143 Ohio Misc.2d 27, 2007-Ohio-5404, a decision by a common pleas court judge within this district, in support of both his motion before the juvenile court and his brief on appeal. In Sharma, the trial court held that a defendant's unstipulated polygraph results are admissible where the defendant first takes the stand in his own defense and the polygraph experts are subject to cross-examination by the State. Id. at ¶ 49. The Sharma case has not been appealed to this Court; accordingly we have not had the opportunity to review that judgment of the Summit County Court of Common Pleas. There is only one reported case which cites Sharma, that being a case out of the Clermont County Court of Common Pleas. State v. Bell,145 Ohio Misc.2d 55, 2008-Ohio-592. The Bell court rejected the reasoning and holding of Sharma. Bell at ¶ 37-42.
 {¶ 9} The Ohio Supreme Court has long held that a trial court has discretion to admit the results of a polygraph examination for purposes of corroboration or impeachment only if both the State and the defendant "sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state."State v. Souel (1978), 53 Ohio St.2d 123, syllabus; see, also, State v.Jackson (1991), 57 Ohio St.3d 29, 37. More recently, the high court has stated: *Page 4 
 "We have not adopted the unrestrained use of polygraph results at trial, and polygraphs themselves remain controversial. Only if there is a stipulation between the parties do we allow the admission of polygraph results at trial, and then for corroboration or impeachment only." In re D.S., 111 Ohio St.3d 361, 2006-Ohio-5851, at ¶ 13, citing Souel, supra.
 {¶ 10} In light of the express holdings of the Ohio Supreme Court, the polygraph was not admissible. The parties did not stipulate to the juvenile's submission to the polygraph examination or to the admission of the results at adjudication. Accordingly, the juvenile court did not abuse its discretion by denying J.F.'s motion to admit the polygraph results. The juvenile's second assignment of error is overruled.
 ASSIGNMENT OF ERROR I "THE TRIAL COURT'S JUDGMENT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND IS UNSUPPORTED BY THE EVIDENCE."
 ASSIGNMENT OF ERROR III "THE TRIAL COURT ERRED IN DENYING THE [CRIM.R] 29 MOTIONS FOR ACQUITTAL."
 {¶ 11} J.F. argues that the juvenile court erred in overruling his motion for judgment of acquittal pursuant to Crim. R. 29 because the State presented insufficient evidence to support the charges of rape and felonious assault. The juvenile further argues that his adjudication is against the manifest weight of the evidence. This Court disagrees.
 {¶ 12} When making these determinations, this Court applies the same standard of review as that applied in an adult criminal context. SeeIn re R.T., 9th Dist. Nos. 05CA008728 and 05CA008742, 2006-Ohio-1311, at ¶ 9.
 {¶ 13} Crim. R. 29 provides, in relevant part:
 "(A) The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The *Page 5 
court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case."
 {¶ 14} A review of the sufficiency of the State's evidence and the manifest weight of the evidence adduced at trial are separate and legally distinct determinations. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citing State v. Thompkins (1997),78 Ohio St.3d 380, 390 (Cook J., concurring). When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction.State v. Jenks (1991), 61 Ohio St.3d 259, 279.
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus.
 {¶ 15} A determination of whether a conviction is against the manifest weight of the evidence, however, does not permit this Court to view the evidence in the light most favorable to the State to determine whether the State has met its burden of persuasion. State v. Love, 9th Dist. No. 21654, 2004-Ohio-1422, at ¶ 11. Rather,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
 "Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. Thompkins, 78 Ohio St.3d at 387. Further when reversing a conviction on the basis that it was *Page 6 
against the manifest weight of the evidence, an appellate court sits as a `thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony. Id." State v. Tucker, 9th Dist. No. 06CA0035-M, 2006-Ohio-6914, at ¶ 5.
This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the defendant and against conviction. Thompkins, 78 Ohio St.3d at 387.
 {¶ 16} This Court has stated that "sufficiency is required to take a case to the jury[.] *** Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Emphasis omitted.) State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462.
 {¶ 17} J.F. was adjudicated delinquent by reason of rape in violation of R.C. 2907.02(A)(1)(b), which states:
 "No person shall engage in sexual conduct with another who is not the spouse of the offender *** when *** [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."
"Sexual conduct" includes, among other things, the unprivileged insertion, however slight, of any body part or any object into the anal opening of another. R.C. 2907.01(A).
 {¶ 18} J.F. was also adjudicated delinquent by reason of felonious assault in violation of R.C. 2903.11(A)(1), which states, in relevant part, that "[n]o person shall knowingly *** [c]ause serious physical harm to another[.]"
 {¶ 19} R.C. 2901.22(B) states:
 "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 20} R.C. 2901.01(5) defines "serious physical harm to persons" as any of the following: *Page 7 
 "(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
 "(b) Any physical harm that carries a substantial risk of death;
 "(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
 "(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
 "(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."
 {¶ 21} At the adjudicatory hearing, Donna Abbott, R.N., testified that she has worked at the CARE Center at Akron Children's Hospital ("Children's") for sixteen years. She testified that she evaluates children who present with suspicions or allegations of abuse, in particular sexual abuse. Nurse Abbott testified that the 22-month old female victim was admitted to Children's on April 30, 2008, and that she evaluated the child around 11:00 a.m. the next day. She further testified as follows.
 {¶ 22} Nurse Abbott spoke with the victim's mother to obtain a history. The mother reported that a neighbor boy came over the evening before and he ate ice cream with her and her two young children. The mother then gave her daughters a bath around 8:30 p.m., wrapped the 22-month old in a towel and placed her on a couch in the living room as the mother went to her car to retrieve diapers. When the mother reentered the house, she saw there was blood on her child which she believed to be coming from the child's vagina. The mother reported that she saw tears around the child's vagina and brought her to the hospital.
 {¶ 23} Nurse Abbott performed a head-to-toe examination of the victim and used a colposcope, a magnifying device with a camera, to inspect and photograph the child's vaginal/anal area. She noted marked and severe injuries to the child's anus, including macerated skin, three tears around the anus, circumferential bruising around the anus caused by the trauma *Page 8 
to the anus itself, and a somewhat dilated anus, indicating damage to the elasticity of the sphincter. Nurse Abbott testified that the victim's injuries were some of the most severe injuries she had ever seen. She asserted that the injuries were fairly recent, having been inflicted within the previous 18-24 hours. At the time, the child had been in the hospital for at least 12 hours. Nurse Abbott testified that it was possible that the injuries were caused by multiple-finger digital penetration.
 {¶ 24} Nurse Abbott testified that a rape kit was completed and sent to BCI, although she was not aware of the results. The parties stipulated that the results of the rape kit were negative for semen and DNA.
 {¶ 25} The victim's mother ("Mother") testified that she is a single mother of two girls who were 4 years and approximately 20 months old at the time of the incident. Mother testified that at approximately 8:00 p.m. on April 30, 2008, J.F., who lived across the street, came to her home and asked if could stay there. She testified that J.F. told her that his mother was not home and he did not have a key to his home. Mother further testified as follows.
 {¶ 26} Mother offered J.F. ice cream because she and her daughters were eating some. J.F. made himself an ice cream cone and asked for another. As J.F. made himself another cone, Mother took her daughters to the bathroom to give them a bath before bedtime. She testified that the victim had no injuries at the time of her bath. After the bath, Mother wrapped the victim in a towel and placed her on a couch in the living room. J.F. was sitting on the other couch. Mother left the victim on the couch and went to the front room to get a diaper for the child. When she saw the diaper drawer was empty, Mother went to her car to retrieve diapers she had placed there when she visited her mother a day earlier. Mother testified that her vehicle was approximately *Page 9 
30 feet from her front door and that she was only away from the victim for "[t]wo to three minutes, tops." She continued to testify as follows.
 {¶ 27} When Mother reentered the house, the victim was no longer on the couch. She found the victim lying face down on the kitchen floor, screaming, as J.F. stood directly behind the child near her buttocks. J.F. told Mother that there was something wrong with the child and that she was "tripping." Mother noticed that the child was bleeding from her rectal area, and she brought the child to the bathroom to rinse her and determine where she was bleeding. J.F. followed her. Mother asked him what happened. J.F. responded, "What, do you think I tried to f**k her?" J.F. then ran out the door and Mother never saw him again.
 {¶ 28} Mother testified that she wrapped the victim in another towel and immediately drove her to the hospital. The victim's medical records, which were admitted into evidence, indicate that she was admitted to the hospital at 8:54 p.m. on April 30, 2008.
 {¶ 29} Mother testified that she cooperated with the police who asked to conduct a "sweep" of her house to investigate the incident. She testified that she did not see anything in her home which might have caused the injuries to her child. She testified that Children's Services Board ("CSB") also conducted an investigation but did not establish a case plan or determine that Mother had done anything to harm the child. Mother denied harming the child on this occasion or any other. She admitted that the child had been burned and cut in two separate prior accidents, and that CSB investigated the burn incident and closed the case.
 {¶ 30} Detective Guy Sheffield, of the Akron Police Department's Crimes Against Juveniles Bureau, testified that he was called to investigate this incident early in the morning of May 1, 2008, although the call regarding the incident came in to dispatch during the evening of April 30, 2008. He testified that he spoke with Mother at the hospital, and got her story and her *Page 10 
consent to search her home. Detective Sheffield testified that Mother was cooperative, answering all his questions and turning over the bath towel in which she had originally wrapped the victim. Mother earlier admitted during her testimony that she was initially hesitant to turn over the towel because it was one of the few things she had left from her children's deceased father.
 {¶ 31} Detective Sheffield testified that his investigation indicated that the victim's injuries were not accidental. He testified that the police used an alternate light source to illuminate bodily fluids but they saw none. The detective testified that no DNA or semen was identified in the rape kit but that those results were not unusual in such cases. He testified that he subscribes to the "all-inclusive rule," that everything available constitutes evidence and everyone around is considered a suspect. Accordingly, he testified that he initially considered Mother to be a suspect but that his investigation led him to believe that J.F. was the likely perpetrator of the abuse on the victim. Detective Sheffield testified that he went to J.F.'s house in the early hours of May 1, 2008, but that the juvenile's mother denied him access to her son at that time.
 {¶ 32} The juvenile's mother, E.S.W., testified that J.F. attended special classes at high school because he was mentally handicapped and had been diagnosed with ADHD since kindergarten. She testified that she tried to be home when J.F.'s school bus dropped him off, but that she told him to sit on the porch and wait for her if she was not home. Ms. W. testified that J.F. did not have a house key on the date of the incident because he repeatedly lost keys.
 {¶ 33} Ms. W. testified that she got home from work on April 30, 2008, between 2:30 and 3:00 p.m., but that J.F. had been dropped off before she arrived. She testified that she did not know where J.F. went after he arrived home to find the door locked. She testified that she learned some time between 8:00 and 8:30 p.m. that J.F. had been at the victim's house that *Page 11 
evening. Ms. W. testified that she had earlier learned that her son was spending time at the victim's home and she thought that the 14-year old J.F. was too old to sit over there with Mother and her two young girls. She testified that Mother told her that J.F. was no problem and that they all watched movies together.
 {¶ 34} Ms. W. testified that during the week of April 30, 2008, she saw unknown persons go in and out of Mother's home. She testified that during April 2008, she walked into Mother's house and found Mother and a man in bed under the covers with the victim baby lying on top of the covers between the two adults. She testified that the child was wearing only a diaper. Ms. W. testified that the scene made her uncomfortable.
 {¶ 35} Ms. W. denied that she arrived home on April 30, 2008, around 8:55 p.m., or that she told anyone that that was when she arrived home. She testified that she would never leave J.F. unattended for that long.
 {¶ 36} Detective Sheffield was recalled as a rebuttal witness for the State. He testified that the juvenile's mother told him during their 2:30 a.m. conversation on May 1, 2008, that she came home around 8:55 p.m. on April 30, 2008, and that her son was not home. He testified that he did not believe that he documented Ms. W.'s comments inaccurately.
 {¶ 37} This Court concludes that this is not the exceptional case, where the evidence weighs heavily in favor of J.F. J.F. does not dispute that the child sustained the severe injuries as described by Nurse Abbott. He disputes only that he was the perpetrator. Mother testified that the victim had no injuries when she bathed her around 8:30 p.m. on April 30, 2008. She testified that she left the child with J.F. for a couple minutes after the bath when she went to her car to get a diaper. Mother testified that, upon reentering her home, she found the child in another room, screaming and bleeding from the anus, as J.F. stood behind the child near her buttocks. J.F. *Page 12 
responded to Mother's inquiry regarding the child's injuries by asking, "What, do you think I tried to f**k her?" J.F. then ran away. Mother immediately took the child to the hospital, arriving before 9:00 p.m. While the rape kit indicated no presence of semen, Nurse Abbott testified that the victim's injuries could have been caused by digital penetration.
 {¶ 38} A thorough review of the record compels this Court to conclude that there is no indication that the trier of fact lost its way and committed a manifest miscarriage of justice in adjudicating J.F. delinquent by reason of rape and felonious assault. J.F.'s adjudication is not against the manifest weight of the evidence. Because J.F.'s adjudication is not against the manifest weight of the evidence, this Court further necessarily concludes that there was sufficient evidence to support the juvenile court's adjudication. J.F.'s first and third assignments of error are overruled.
 III. {¶ 39} J.F.'s assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the *Page 13 
period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30. Costs taxed to Appellant.
MOORE, P. J., BELFANCE, J., CONCUR. *Page 1