123

THE STATE OF OHIO, APPELLEE, *v.* SOUEL, APPELLANT.
[Cite as State v. Souel (1978), 53 Ohio St. 2d 123.]

(No. 77-486.—Decided February 22, 1978.)

124

126

128

*Mr. George C. Smith*, prosecuting attorney, and *Mr. Alan C. Travis*, for appellee.

*Mr. Myron Shwartz*, for appellant.

Celebrezze, J. The appellate court below certified the following question for final determination by this court:

"Whether the results of a polygraph examination are admissible into evidence when the defendant, prior to the examination, consents by written stipulation to the admissibility thereof, but withdraws his consent after the results of the test are known but prior to introduction of the testimony at trial."

For the reasons hereinafter set forth we resolve this question in the affirmative.

The decisions of other jurisdictions relative to this precise issue have not been consistent or uniform. Basically, there are three views on this subject.[3] One line of authority holds that the results of a polygraph test are almost always inadmissible, regardless of whether the test is taken pursuant to a stipulation. See, *e. g., Pulakis* v. *State* (Alaska, 1970), 476 P. 2d 474; *State* v. *Corbin* (La. 1973), 285 So. 2d 234. Other courts, applying principles of estoppel, have held that once an individual has stipulated to the admissibility of polygraph examination results it would be unreasonable to allow him to prevent their introduction solely because the results appear to be unfavorable. See, *e. g., State* v. *McNamara* (1960), 252 Iowa 19, 104 N. W. 2d 568; *State* v. *Fields* (Mo. 1968), 434 S. W. 2d 507. A third view, and the one which this court endorses, is that where a polygraphic examination is admin-

---

[3]A small minority of jurisdictions will admit, or recognize the possibility of admitting, polygraph test results in the absence of a stipulation between the parties. The subject must voluntarily agree to take the test, since the United States Supreme Court has held that polygraph evidence is "essentially testimonial" (*Schmerber* v. *California* [1966], 384 U. S. 757, 764). However, there is no corresponding necessity that the prosecutor stipulate to the admissibility of the results at trial. A defendant who wishes to take a polygraph examination and admit the results will be permitted to do so, subject only to broad discretion in the trial judge to disallow the evidence in a particular case if the test was improperly conducted. See *United States* v. *Ridling* (E. D. Mich. 1972), 350 F. Supp. 90; *Commonwealth* v. *A Juvenile* (1974), 365 Mass. 421, 313 N. E. 2d 120; *State* v. *Dorsey* (1975), 88 N. M. 184, 539 P. 2d 204.

istered pursuant to a stipulation entered into by the parties, the results thereof are admissible in evidence in a criminal trial, but only when certain safeguards have been observed. Examination of the leading decision in this line of authority discloses the qualifications which this court deems to be essential.

In *State* v. *Valdez* (1962), 91 Ariz. 274, 371 P. 2d 894, the defendant appealed his conviction for possession of narcotics. At trial a polygraph examiner had testified, over objection, as to the results of an examination (unfavorable to defendant) conducted pursuant to a written stipulation. In the course of its review the Supreme Court of Arizona discussed several earlier cases involving the admissibility of lie detector evidence, and noted the considerable improvements in instrumentation and technique since the first such decision was rendered in *Frye* v. *United States* (1923), 54 App. D. C. 46, 293 F. 1013.⁴ The court expressed its opin-

---

⁴In holding that the forerunner of the polygraph had not yet achieved general recognition and acceptance among psychologists and physiologists so as to support the admission in evidence of expert testimony relative thereto, the court in *Frye* v. *United States* (1923), 54 App. D. C. 46, 293 F. 1013, stated, at page 1014:

"* * * Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

This standard for admissibility of polygraph evidence has not gone unchallenged, and some commentators contend that normal evidentiary requirements should be substituted for the artificially high test first established in *Frye*. See, e. g., Kaplan, The Lie Detector: An Analysis of Its Place in the Law of Evidence, 10 Wayne L. Rev. 381, 402-407 (1964). With regard to the *Frye* decision, Professor McCormick has made the following comments:

"* * * 'General scientific acceptance' is a proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence. Any relevant conclusions which are supported by a qualified expert witness [footnote omitted] should

ion that although the polygraph had not as yet been perfected, or risen to the status of "general acceptance," the standard for admissibility proposed in *Frye, supra,* the device was "developed to a state in which its results

be received unless there are other reasons for exclusion. Particularly, probative value may be overborne by the familiar dangers of prejudicing or misleading the jury, and undue consumption of time. If the courts used this approach, instead of repeating a supposed requirement of 'general acceptance' not elsewhere imposed, they would arrive at a practical way of utilizing the results of scientific advances." (Footnotes omitted.)  McCormick On Evidence (2d Ed. 1972), 491, Section 203.

As to the judicial reluctance to accept polygraph evidence in the more than five decades since *Frye* was decided, Professor McCormick concludes at pages 506-507, as follows:

"In the numerous opinions and the large commentary, the principles underlying the test, the qualifications and procedures of the polygraph operator, and the considerable statistics developed concerning the technique, have been subjected to a more searching and critical analysis than that accorded to any other form of evidence considered in this chapter. Neither the concessions of critics that its accuracy in the detection of insincerity is of the order of 70 percent or more, nor the widespread use of and reliance upon it in police investigation, business, industry, and government, nor the persistent efforts of trial courts to make some use of the evidence, have made any inroads on that position.

"As suggested in a previous section, the explanation can scarcely be found in any serious contention that even the opinion of a qualified expert in the field throws no light on the question of whether relevant statements made by a party or witness were sincere or not. The exclusion seems to rest more upon a judicial estimate of the weight that the trier of fact will give to the opinion, and a demand that the opinion be almost infallible because the trier will think it so.

"The one avenue of admissibility that has not been completely closed is that of stipulation by the parties. From an early case, allowing the use of the test evidence on this basis, there has developed a growing minority view that the results may be received if the parties enter into an adequate stipulation to that effect. The experience gained in this way, especially on the question whether triers are actually unable to evaluate this type of evidence, may make possible a more informed conclusion on the larger question of general admissibility of polygraph results." (Footnotes omitted.)

are probative enough to warrant admissibility upon stipulation." *Valdez*, at page 283. The Arizona high court therefore held that polygraphic evidence was admissible in evidence in criminal trials, provided that the following qualifications were met:

"(1) That the county attorney, defendant and his counsel all sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.

"(2) That notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial judge, i. e. if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

"(3) That if the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

"a. the examiner's qualifications and training;

"b. the conditions under which the test was administered;

"c. the limitations of and possibilities for error in the technique of polygraphic interrogation; and

"d. at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.

"(4) That if such evidence is admitted the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate that at the time of the examination defendant was not telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given." *Valdez*, at pages 283-284.

This qualified approach to acceptance of polygraphic test results as evidence has been approved in other jurisdictions, several of which have adopted the guidelines set

out in *Valdez, supra.* See *State* v. *Galloway* (Iowa, 1969), 167 N. W. 2d 89; *State* v. *Lassley* (1976), 218 Kan. 758, 545 P. 2d 383; *State* v. *McDavitt* (1972), 62 N. J. 36, 297 A. 2d 849; *State* v. *Steele* (1975), 27 N. C. App. 496, 219 S. E. 2d 540; *State* v. *Ross* (1972), 7 Wash. App. 62, 497 P. 2d 1343; *State* v. *Stanislawski* (1974), 62 Wis. 2d 730, 216 N. W. 2d 8; *Cullin* v. *State* (Wyo. 1977), 565 P. 2d 445.

We adopt the *Valdez* qualifications because these requisites respond to the major objections to the admission of polygraph evidence. The requirement of mutual agreement to a written stipulation, and the supervisory power of the trial judge, will insure control over what is generally recognized as the single most important variable affecting the accuracy of the polygraph test results, *viz.* the polygraph examiner. See Note, 48 N. Y. U. L. Rev. 339 (1973). In addition, the opportunity for cross-examination of the operator by opposing counsel and the delivery of a limiting instruction by the trial court will help to prevent encroachment upon the jury function by undue reliance on this expert testimony.

Despite the ongoing controversy concerning the degree of accuracy of the polygraph device,[5] it is our opinion that observance of the *Valdez* qualifications establishes a proper foundation for the admission of polygraph test results, and that these results have probative value in the determination of whether the examinee has been deceptive during interrogation. We note with approval the sentiments expressed by the Supreme Court of Wyoming in *Cullin* v. *State, supra,* a very recent decision on the

---

[5]For estimates of accuracy see F. Horvath and J. Reid, The Reliability of Polygraph Examiner Diagnosis of Truth and Deception, 62 Journal of Criminal Law, Criminology and Police Science 276, 278-279 (1971) (91.4 percent accurate for examiners with more than one year's experience); R. Pfaff, The Polygraph: An Invaluable Judicial Aid, 50 A. B. A. J. 1130, 1132 (1964) (96 percent accurate, 3 percent inconclusive, 1 percent maximum known error); L. Burkey, The Case Against the Polygraph, 51 A. B. A. J. 855, 856 (1965) (70 percent accurate).

precise issue *sub judice,* wherein the following appears at page 458:

"We see no reason why the polygraph expert should be treated in any more restrictive manner than other experts. That the polygraph deals with mind and body reactions should not subject it to exclusion from consideration any more than other testimony of a scientific nature. We have long utilized the expertise of psychiatrists and psychologists to furnish advice and assistance to the jury to explore the mysteries of the mind with respect to mental illness as a defense. Medical doctors are regularly called upon to testify as to the intricate workings of the body in sensitive questions of a complex physical condition or cause of death. It is the normal obligation of the trial judge to protect the jurors from exposure to evidence which might mislead them, regardless of whatever kind of scientific evidence is under scrutiny. The device of cross-examination soon smokes out the inept, the unlearned, the inadequate self-styled expert."

In the cause at bar we find that the requisite conditions for admissibility of polygraph evidence were met. There was substantial evidence tending to indicate that appellant committed the offenses for which he was convicted, and the polygraph evidence was thus merely corroborative. Under these circumstances we hold that the trial court did not err in admitting in evidence the polygraph test results and the expert opinion relative thereto.

Accordingly, the judgment of the Court of Appeals is hereby affirmed.

*Judgment affirmed.*

HERBERT, W. BROWN, SWEENEY and LOCHER, JJ., concur.

O'NEILL, C. J., and P. BROWN, J., dissent.