{¶ 1} Defendant-Appellant Reginald Tucker appeals from his conviction and sentence for Aggravated Murder, Kidnapping, Aggravated Robbery, and Having a Weapon Under Disability. On appeal Tucker insists that the trial court should have suppressed witness identification testimony, Tucker's statements, and the results of a *Page 2 
failed polygraph examination. He also maintains that his convictions were both against the manifest weight of the evidence and unsupported by sufficient evidence. We find that the identification testimony, statements, and polygraph results were properly admitted into evidence. Moreover, Tucker's convictions were supported by sufficient evidence, and they were not against the manifest weight of the evidence. Accordingly, we affirm the judgment of the trial court.
 I {¶ 2} Antoinette Hollingsworth left her home to go shopping on the afternoon of November 27, 2005. Several minutes later she was seen making a purchase at a nearby Family Dollar store. Three friends, Marquita George, Serethia Sumlin, and Chris Hilliard, were walking to the grocery store when they first saw Antoinette. She walked down Groveland Avenue, about a block from the Family Dollar, and stopped at an alley next to a church. By that time she was in the company of Tucker and his then-juvenile co-defendant, S.R. George, Sumlin, and Hilliard recognized Tucker and S.R. as men they either knew or had seen around the neighborhood, but the three did not know Antoinette. Tucker appeared to be looking around the corner of the church as if to see if anyone was coming. Sumlin noticed that S.R. appeared to have a gun in his pocket. Both she and Hilliard thought the two men were going to rob the woman. The three continued walking to the grocery store, but before they arrived, they heard a gunshot.
 {¶ 3} In the meantime, Quinton Smith arrived home and drove up the alley to park his car behind his home. Smith saw two young black men and a young black woman arguing. One of the men was wearing a black coat with a hoodie or a hat pulled *Page 3 
up over his head, hiding his face from view. The other man, who was of a slightly larger build and with a lighter complexion, was wearing a tan or light brown coat.
 {¶ 4} As Smith approached, the woman ran up to his car begging him for help because the two men were going to hurt her. Smith saw the young man in the tan coat walking away. Smith refused to let Antoinette get into his car, and the man in the black coat then dragged her away from Smith's car. As Smith pulled into his driveway, he saw Antoinette on the ground with Tucker hitting her. Smith heard Antoinette yell, "Take what you want, just leave me alone." As Smith got out of his car, he heard a gunshot and turned toward the sound. He saw the young man in the dark coat running away. Seeing Antoinette lying on the ground amidst her belongings, with a bullet wound to her head, Smith called 911.
 {¶ 5} When Dayton Police arrived, Smith gave them a description of the two men that he had seen in the alley. Some officers immediately began to canvass the area searching for the suspects. Within a few minutes of the shooting, officers found four young black men just a few blocks away from the crime scene. Two of the men were wearing black coats, and two were wearing brown coats. The police detained all four men and put them into the back seats of two cruisers. Tucker and S.R. were two of the men detained, and were coincidentally placed in the same cruiser. All four men were driven back to the crime scene for a show-up to see if Smith recognized any of them. Smith immediately recognized S.R. because he had seen S.R. walking in the alley several times earlier that day. Smith could not make a facial identification of Tucker, but he did recognize Tucker's coat.
 {¶ 6} During the show-up George, Sumlin, and Hilliard were returning from the *Page 4 
grocery store and approached the crime scene. They saw Antoinette lying in the alley, so approached for a closer look. They saw Tucker and S.R. in the cruiser and commented to each other that the police had arrested the two men that they had seen with the woman prior to the shooting. The three left without talking to police. As officers talked to other witnesses, they learned of the trio's comments, so one officer was sent to find them. When the officer found the three friends, they reluctantly agreed to return with him to the crime scene to talk to a detective.
 {¶ 7} Police also found a neighbor boy who had heard S.R., Tucker, and Antoinette arguing in the alley behind his house. He could not make out most of the words, but he did hear a female voice say, "Dang, my purse." Soon after that he saw S.R., whom he knew, leaving the alley. The boy then heard a gunshot and looked out his window, and he saw the man in the dark coat running from the alley. At trial the boy recognized Tucker's coat as the one worn by the man he had seen running from the alley.
 {¶ 8} Tucker and S.R. were transported to the Safety Building, where they were questioned about their involvement in the shooting. At that time police were investigating the case as a felonious assault, but after Antoinette died two days later, it became a murder investigation. Tucker denied any involvement in the shooting, claiming that he had been watching football with Antawan Knight and Ronnie Barnes. However, both Knight and Barnes denied that this was true.
 {¶ 9} While Tucker was in jail awaiting trial, Detective Philip Olinger learned that Tucker's DNA matched DNA recovered during the investigation of a 1999 rape. Detective Olinger went to question Tucker, making clear from the start that he was there *Page 5 
only to discuss the rape and not any of the pending charges. At the conclusion of the interview, Tucker spontaneously asked Detective Olinger if DNA evidence had been found on the clothing that he was wearing when arrested for Antoinette Hollingsworth's murder, and if he would get a report from the crime lab.
 {¶ 10} A few days before trial was to begin, Tucker demanded that his attorneys approach prosecutors to arrange for a polygraph examination. Despite the advice of counsel to the contrary, Tucker entered into an agreement with the State. The agreement stated that if Tucker passed the test, that evidence would be admitted at trial, but if he failed Tucker would plead guilty to all charges. If the results were inconclusive, neither side would mention the exam at trial. The polygraph examiner subsequently determined that Tucker was being deceptive when he denied involvement in the shooting death of Antoinette Hollingsworth.
 {¶ 11} A grand jury indicted Tucker on one count of Aggravated Robbery, accompanied by firearm and repeat violent offender specifications; one count of Kidnapping with the same specifications; one count of Having a Weapon Under Disability, with a firearm specification; and three counts of Aggravated Murder, accompanied by firearm specifications as well as various capital specifications. He filed three separate motions to suppress, all of which the trial court overruled.
 {¶ 12} Tucker did not enter guilty pleas as agreed to prior to his polygraph examination. Instead, he proceeded to trial, electing to have his case tried before a three-judge panel. The panel acquitted Tucker of one of the Aggravated Murder charges, with its attendant specifications, but found Tucker guilty of all remaining charges and specifications. At sentencing the trial court merged the two Aggravated *Page 6 
Murder convictions; the Kidnapping and Aggravated Robbery convictions; and all of the firearm specifications. The court ordered an aggregate sentence of 43 years to life. From his conviction and sentence, Tucker appeals.
 II {¶ 13} Tucker's First Assignment of Error is as follows:
 {¶ 14} "THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION TO SUPPRESS IDENTIFICATION TESTIMONY OF THE STATE'S WITNESS QUINTON SMITH FROM AN UNCONSTITUTIONAL SHOW UP."
 {¶ 15} In his First Assignment of Error, Tucker argues that the trial court should have suppressed the identification testimony of Quinton Smith because the show-up was impermissibly suggestive. Show-ups at or near the scene of a crime, that occur shortly after the crime, are not only permissible, but useful, since they can lead to an identification or non-identification while the characteristics of the perpetrator are still fresh in the witness's memory. Neil v. Bigger (1972), 409 U.S.188,93 S.Ct. 375. However, the show-up must not be unduly suggestive. Id. The defendant bears the burden to prove that a show-up procedure was so suggestive of guilt that it requires suppression. Id., at 199; State v.Murphy (2000), 91 Ohio St.3d 516, 534, 747 N.E.2d 765. Because Tucker failed to meet that burden, we affirm the trial court's denial of his motion to suppress Smith's identification testimony.
 {¶ 16} The four suspects were brought to the scene about twenty minutes after the shooting. When the suspects arrived, Officer Mollohan advised Smith not to talk to the men, but just to look to see if he recognized any of them. Nothing more was said or *Page 7 
done by any officer prior to the show-up. In the first cruiser Smith immediately recognized S.R. as the man he had seen in the alley wearing the light brown coat. He was very confident of that identification because he had seen S.R. in the alley several times earlier that day. Smith could not make a facial identification of Tucker, who happened to have been placed in the same cruiser as S.R., but Smith did recognize Tucker's coat. Despite the identifications of Tucker and S.R., Officer Mollohan asked Smith to also take a look at the two men in the other cruiser. Smith did not recognize either of them.
 {¶ 17} There is no indication that the show-up was improperly conducted. Smith was simply asked to look at four men to see if he recognized any of them. Such a neutral statement to explain the procedure is not impermissibly suggestive of guilt. See, e.g., State v.Carruth, Montgomery App. No. 19997, 2004-Ohio-2317, ¶ 16. There is no evidence that Smith felt forced to identify anyone or that Officer Mollohan was asking Smith to corroborate the officer's suspicion of guilt, either of which may make the process impermissibly suggestive. Id.
 {¶ 18} Because the show-up in this case was not impermissibly suggestive, the trial court did not err in denying Tucker's motion to suppress Smith's identification testimony. Accordingly, Tucker's First Assignment of Error is overruled.
 III {¶ 19} Tucker's Second Assignment of Error is as follows:
 {¶ 20} "THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION TO SUPPRESS EVIDENCE REGARDING CUSTODIAL STATEMENTS TAKEN FROM *Page 8 
APPELLANT, WHICH WERE TAKEN IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS UNDER THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS."
 {¶ 21} In his Second Assignment of Error, Tucker asserts that the trial court should have suppressed his spontaneous questions to Detective Olinger regarding possible DNA evidence on the clothes that he was wearing when he was arrested. Tucker's Sixth Amendment right to counsel pertaining to the murder case would only have been violated by Detective Olinger if the detective "deliberately elicited" incriminating statements from Tucker in the absence of counsel. Massiah v. UnitedStates (1964), 377 U.S. 201, 206, 84 S.Ct. 1199; Fellers v. UnitedStates (2004), 540 U.S. 519, 524, 124 S.Ct. 1019. There is no evidence that this is true.
 {¶ 22} Detective Olinger clearly advised Tucker that he was there to discuss the 1999 rape and not the more recent charges for which Tucker was awaiting trial. Tucker signed a waiver of his rights and talked freely with the detective. Following that discussion, Tucker spontaneously asked the detective if he could ask a question. Believing that Tucker was inquiring about the rape case, Detective Olinger agreed. Tucker then proceeded to ask a few questions about whether DNA evidence had been found on the clothing he had been wearing when he was arrested for the murder. Detective Olinger told Tucker that he did not know the answers to those questions, and the conversation ended. Detective Olinger did nothing to prolong the conversation, and he made no effort to elicit any incriminating statements from Tucker.
 {¶ 23} The questions were voluntary and initiated by Tucker himself while he was being questioned about an unrelated crime, and there is no evidence that Detective Olinger sought to deliberately elicit any incriminating statements. Therefore, Tucker has *Page 9 
failed to demonstrate that he was compelled to give evidence against himself, in violation of his Fifth Amendment privilege against self-incrimination, and his Second Assignment of Error is overruled.
 IV {¶ 24} Tucker's Third Assignment of Error is as follows:
 {¶ 25} "THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION TO SUPPRESS THE STIPULATED POLYGRAPH BECAUSE THE STIPULATION WAS UNREASONABLE, AND THE STATE USED THE POLYGRAPH RESULTS AS MORE THEN [sic] JUST CORROBORATION FOR THEIR OTHER EVIDENCE."
 {¶ 26} In his Third Assignment of Error, Tucker insists that the polygraph results should have been excluded because the agreement that he made with the State was unconscionable and because the State used the results as primary evidence of guilt. To the contrary, we find that the evidence was used as corroborative evidence and not as primary evidence. Furthermore, although the written agreement was tilted heavily in favor of the State, the agreement, at least as it was actually enforced, was not unreasonable.
 {¶ 27} In Ohio, the results of polygraph examinations are generally not admissible unless both parties stipulate to admission. State v.Jackson (1991), 57 Ohio St.3d 29, 37, 565 N.E.2d 549. In State v.Souel (1978), 53 Ohio St.2d 123, 372 N.E.2d 1318, the Supreme Court set forth several conditions that must be met before the results of a polygraph test are admissible in a criminal trial for purposes of corroboration or impeachment: *Page 10 
 {¶ 28} "(1) The prosecuting attorney, defendant and his counsel must sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.
 {¶ 29} "(2) Notwithstanding the stipulation, the admissibility of the test results is subject to the discretion of the trial judge. . . .
 {¶ 30} "(3) If the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner. . . .
 {¶ 31} "(4) If such evidence is admitted the trial judge should instruct the jury to the effect that the examiner's testimony does not tend to prove or disprove any element of the crime. . . and that it is for the jurors to determine what weight and effect such testimony should be given." Id. at 132.
 {¶ 32} Defense counsel advised the court that Tucker had repeatedly requested a polygraph examination, finally insisting both orally and in writing that counsel propose a stipulated polygraph to the State. Prior to execution of the written agreement, counsel had many separate conversations with Tucker, discussing each and every paragraph of the agreement. The agreement stated that if Tucker passed the test, the results would be admitted without objection from the State. If Tucker failed the test, he agreed to plead guilty to all charges and specifications. And, if the results were inconclusive, no mention of the polygraph would be made at trial. The court questioned Tucker extensively to ensure that he understood and agreed with the agreement that he was signing and that he realized that he was doing so against the advice of his experienced trial counsel. *Page 11 
 {¶ 33} Tucker was eager to obtain the advantage of a favorable polygraph examination, so much so that he entered into the agreement against the advice of his counsel. The advantage to Tucker, had he passed the test, was not a negligible one. To the contrary, Tucker would have received the significant benefit of letting the jury know, without objection from the State, that he had passed the polygraph test. We pass no judgment on whether this agreement would have been unconscionable if it had been enforced as written, requiring Tucker to plead guilty to all charges and specifications; in this case, Tucker was not forced to enter a guilty plea, but was allowed to, and did, proceed to trial.
 {¶ 34} Furthermore, we disagree with Tucker's claim that the evidence was used as primary evidence of his guilt. Contrary to his assertion, the State did offer evidence of Tucker's identity as the perpetrator of the crimes against Antoinette Hollingsworth. Tucker was facially identified by George, Sumlin, and Hilliard as one of the two men standing with Antoinette just minutes before the shooting. Furthermore, Smith recognized Tucker's coat as the one worn by the man who had dragged Antoinette away from the car and shot her. Therefore, the polygraph evidence was used as corroborative evidence.
 {¶ 35} Tucker's Third Assignment of Error is overruled.
 V {¶ 36} Tucker's Fourth Assignment of Error is as follows:
 {¶ 37} "THE TRIAL COURT ERRED IN FINDING THE APPELLANT GUILTY OF AGGRAVATED MURDER, KIDNAPPING AND BURGLARY [sic] AS THE *Page 12 
CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WERE NOT SUFFICIENTLY SUPPORTED BY THE EVIDENCE PRESENTED."
 {¶ 38} Tucker's Fifth Assignment of Error is as follows:
 {¶ 39} "THE TRIAL COURT ERRED IN NOT GRANTING THE APPELLANT'S MOTION FOR AN ACQUITTAL AT THE CLOSE OF THE STATE'S CASE BECAUSE THE EVIDENCE PRESENTED WAS INSUFFICIENT TO SURVIVE A CRIMINAL RULE 29 MOTION FOR ACQUITTAL."
 {¶ 40} In his Fourth Assignment of Error, Tucker argues that his convictions for Aggravated Robbery, Aggravated Murder, and Kidnapping are against the manifest weight of the evidence and are not supported by sufficient evidence. In his Fifth Assignment of Error, he contends that the trial court should have granted his Crim. R. 29 motion for acquittal because the State failed to offer sufficient evidence of his guilt. A review of the record illustrates that the State did offer sufficient evidence to justify submitting the case for deliberation and that the convictions are not against the manifest weight of the evidence.
 {¶ 41} Criminal Rule 29(A) requires a trial court to enter a judgment of acquittal "if the evidence is insufficient to sustain a conviction of such an offense. . . ." A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52. The proper test to apply to the inquiry is the one set forth in paragraph two of the syllabus of State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal *Page 13 
conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."
 {¶ 42} In contrast, when reviewing a judgment under a manifest weight standard of review "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction." Thompkins, supra, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
 {¶ 43} Here the State's evidence was sufficient to prove the crimes of Aggravated Murder, Aggravated Robbery, and Kidnapping. With respect to the Aggravated Robbery charge, there were three witnesses who saw Tucker and S.R., whom they knew, in the alley with Antoinette just minutes before the murder. Sumlin and Hilliard even commented that it looked like S.R. and Tucker were going to rob the woman. A neighbor boy heard arguing, during which he heard a female voice say, "Dang, my purse." Also, Smith heard Antoinette tell Tucker, "Take what you want, just leave me alone." After the shooting, Antoinette's belongings were strewn across the alley. Whether or not Tucker actually took anything from Antoinette, there was enough evidence to prove at least an intent to commit a theft offense. *Page 14 
 {¶ 44} Regarding the Kidnapping charge, immediately before the shooting Smith saw Tucker forcibly drag Antoinette away from Smith's car. Antoinette fell to the ground, and Smith then saw Tucker swinging at her. Moreover, by shooting Antoinette in the head, Tucker guaranteed that she could not prevent him from fleeing the scene. Consequently, the State did prove Tucker's guilt of Kidnapping in violation of R.C. 2905.01(A)(2).
 {¶ 45} Finally, Tucker insists that the State failed to prove the Aggravated Murder charges because the State failed to prove his identity as the shooter. We disagree. George, Sumlin, and Hilliard, all of whom knew Tucker, identified him as one of the two men standing with Antoinette just minutes before the shooting. Furthermore, Smith recognized Tucker's coat as that worn by the shooter, and the neighbor boy recognized the coat as the one worn by the man that he saw sprinting from the alley immediately after the shooting. To some extent, that identification testimony was bolstered both by Tucker's concern regarding possible DNA evidence on his clothing and by the failed polygraph examination. Therefore, the State did prove that Tucker was guilty of both counts of Aggravated Murder.
 {¶ 46} Because Tucker's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence, his Fourth and Fifth assignments of error are overruled.
 VI {¶ 47} All of Tucker's assignments of error having been overruled, the judgment of the trial court is Affirmed.
 GRADY and DONOVAN, JJ., concur. *Page 1