[Cite as *State v. Irwin*, 2015-Ohio-195.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO

       Plaintiff-Appellee

v.

YHANTEG D. IRWIN

       Defendant-Appellant

Appellate Case No.    26224

Trial Court Case No.   2012-CR-3375

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of January, 2015.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by APRIL F. CAMPBELL, Atty. Reg. No. 0089541, Assistant Prosecuting
Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts
Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

JAY B. CARTER, Atty. Reg. No. 0041295, 111 West First Street, Suite 519, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1}   In this case, Defendant-Appellant, Yhanteg Irwin, appeals from a judgment overruling his motion to withdraw a guilty plea.   In support of his appeal, Irwin contends that the trial court erred in failing to afford him a full and fair hearing on his motion to withdraw the plea.  Irwin also contends that the trial court erred in finding his motion to withdraw untimely. Finally, Irwin contends that the trial court erred in overruling his motion to withdraw his plea.

{¶ 2}   We conclude that the trial court did not fail to afford Irwin with a full and fair hearing on the motion to withdraw his guilty plea.   The trial court properly excluded evidence of text messages allegedly sent by a potential witness to Irwin's mother, and also properly excluded polygraph evidence.   The text evidence was not either properly authenticated or reliable, and the polygraph evidence was inadmissible.

{¶ 3}   We further conclude that the trial court properly applied the factors for determining whether a presentence motion to withdraw a plea should be granted.   Accordingly, the judgment of the trial court will be affirmed.

## I.  Facts and Course of Proceedings

{¶ 4}   On November 13, 2012, Detective D.K. Ritchey of the Dayton Police Department filed a complaint in Dayton Municipal Court alleging that Irwin had committed two counts of felonious assault (one with a deadly weapon), and two counts of aggravated robbery (one with a deadly weapon).   The charges arose from an incident that occurred on November 7, 2012, during which Irwin allegedly robbed the occupants of an apartment at 767 Summit Square,

in Dayton, Ohio, and shot Rodney House in the leg.

{¶ 5}  Irwin was arrested, and a probable cause hearing was held in Dayton Municipal Court on November 21, 2012, after which the judge found probable cause to believe that the charged crimes had been committed.  Irwin was remanded to the sheriff's custody to await the grand jury's action, and bond was set at $100,000 cash or surety.

{¶ 6}  The grand jury subsequently indicted Irwin with one count of Aggravated Robbery, one count of Aggravated Robbery (Serious Harm), one count of Felonious Assault, and one count of Felonious Assault (Serious Harm).  All the charges included firearm specifications, and carried a maximum prison term of 22 years.  Irwin pled not guilty to the charges on December 12, 2012, and retained Elizabeth Scott as his counsel.  Jury trial was set for January 22, 2013, but did not take place due to the filing of a motion to suppress the statements that Irwin had made to the police.  The trial court conducted an evidentiary hearing on the motion, which Irwin attended, and the court overruled the motion on January 25, 2013.  On the same day, the defense received a discovery packet from the State, which included an incident history report (four pages); a CD-R labeled "767 Summit Sq."; and 254 pages of hospital records for Rodney House.

{¶ 7}  Another jury trial was set for February 11, 2013, but was continued as the result of a defense request.  Irwin then filed time waivers, and trial was set for June 24, 2013.  On June 19, 2013, Irwin's attorney filed a motion for continuance, claiming that she had just been made aware of an alibi defense.  A notice of alibi was then filed.  The State opposed the motion, claiming that in the months between the indictment and the trial date, Irwin and his family had undertaken numerous attempts to influence the testimony of one of the witnesses, including

promising her a job and a place to live in exchange for her cooperation. The State also alleged that Irwin's family had approached multiple State witnesses and had offered money as an incentive not to appear in court. When that offer was refused, Irwin's family allegedly had made thinly-veiled threats to the witnesses.

{¶ 8} On June 25, 2013, new counsel, Anthony VanNoy, entered an appearance for Irwin. The trial court ordered Irwin to pay jury fees, based on the last-minute request to retain a new attorney, and also continued the jury trial until July 10, 2013. Irwin then filed another motion to suppress on July 10, 2013, this time asking that the court suppress identification evidence. The court held an evidentiary hearing on the motion to suppress, which Irwin attended with his counsel. This suppression hearing was held on July 11, 2013.

{¶ 9} In overruling the second motion to suppress, the trial court noted that Detective Ritchey had prepared a photo spread using Justice Webb, which randomly selects pictures to match a potential suspect, based on the physical criteria that has been inputted. Ritchey then asked various police officers to act as blind administrators in showing the photo spread to the witnesses. These officers showed the photo spread to six eye-witnesses, all of whom selected Irwin as the robber and shooter. All the witnesses were positive that they had selected the correct person. After reviewing the evidence, the trial court concluded that there was no evidence that the photo spread was unduly suggestive. The court additionally held that the photo spread complied with R.C. 2933.83.

{¶ 10} On July 16, 2013, the State provided additional discovery to Irwin's attorney, including CPD incident report #1211070339 (11 pages); a CD-R of scene photos; a CD-R of 911 calls; a CD-R of Irwin's jail calls; written statements of several witnesses; the photospread

packets for several eye-witnesses; incident histories; and a Miami Valley Regional Crime Lab Report.

{¶ 11}   The trial court's decision overruling the motion to suppress the identification evidence was filed on September 28, 2013.   Trial was then set for January 13, 2014.   On January 9, 2014, Irwin appeared in court and pled guilty to Count One, a first degree felony, and Count Three, a second degree felony, both with firearm specifications.   The plea was based on a plea bargain in which the State agreed to nolle the remaining counts of the indictment and to cap any potential prison term at nine years.   The trial court accepted the guilty plea and scheduled a sentencing hearing for January 29, 2014.

{¶ 12}   On January 28, 2014, the State filed a sentencing memorandum, asking the court to impose a prison sentence above the six-year minimum, based on the serious nature of the case and Irwin's alleged lack of remorse.   Irwin then made an oral motion on January 29, 2014, to continue his sentencing hearing, which was granted.   A new sentencing hearing was set for February 5, 2014.   Subsequently, Irwin sent the court a letter, which the court received on January 30, 2014, informing the court that he wanted to retain new counsel, and stating that he wished to vacate his guilty plea.   Irwin's counsel, VanNoy, then filed a motion to withdraw the plea on February 5, 2014.

{¶ 13}   After the court set the matter for a February 20, 2014 hearing on the motion to vacate, Irwin retained new counsel, Jay Carter, who requested another continuance.   The hearing on the motion to vacate took place on March 7, 2014, at which time the court received testimony from Irwin, Irwin's mother, and VanNoy.    After hearing the evidence, the trial court overruled the motion to withdraw the guilty plea.

**{¶ 14}**     Irwin now appeals from the decision overruling his motion to withdraw his plea.

## II.   The Issue of a Full and Fair Hearing

**{¶ 15}**     Irwin's First Assignment of Error states that:

The Trial Court Erred in Failing to Afford Appellant a Full and Fair Hearing on His Motion to Vacate Plea.

**{¶ 16}**     Under this assignment of error, Irwin contends that the trial court erred in refusing to hear evidence that was central to his claim.   These items of evidence include text messages allegedly sent to Irwin's mother, Rose Elhegazy, from a State witness who recanted her statement; and the results of a polygraph examination allegedly administered to Elhegazy.

**{¶ 17}**     As a preliminary matter, we note that the record is not particularly clear with regard to these items of evidence.   Counsel for the State and the defense discussed the matter in chambers prior to the evidentiary hearing on the motion to withdraw, but no transcript of their discussion has been provided on appeal.   Based on the statements on record in the trial court and the statements in the parties' brief, the State and defense apparently both agree that: (1) the   text messages were allegedly from a State witness who recanted her testimony; and (2) Elhegazy would testify that she had traced the texts to the witness using an internet application.   In addition, the polygraph test was apparently taken by Elhegazy, although the subject matter of the test and its results are not discussed in the record.   The trial court rejected testimony about the application used to trace the text messages as unreliable, and also rejected the polygraph information because polygraphs have not been deemed scientifically reliable, and there was no stipulation regarding the polygraph.

{¶ 18}     With respect to the text messages, Irwin contends that Evid.R. 901(A), relating to authentication, establishes a very low threshold for admissibility, and that in situations involving electronic media, printouts are authenticated through the testimony of the recipients.

{¶ 19}     Text messages have been admitted in situations involving a party opponent, or under the exception for business records in Evid.R. 803(6).   *See State v. Roseberry*, 197 Ohio App.3d 256, 2011-Ohio-5921, 967 N.E.2d 233 (8th Dist.) (admission of party opponent), and *State v. Blake*, 2012-Ohio-3124, 974 N.E.2d 730 (12th Dist.) (business records exception).

{¶ 20}     However, before a record may be admitted, it must be properly authenticated. In this regard, Evid.R. 901(A) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."   In this regard, Evid.R. 901(B) provides several examples.   For example, Evid.R. 901(B)(1) allows authentication through the testimony of a witness with knowledge "that a matter is what it is claimed to be."   In the context of telephone conversations, Evid.R. 901(B)(6) states that telephone conversations   may be authenticated "by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (a) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or (b) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone."

{¶ 21}     "[I]in most cases involving electronic print media, i.e., texts, instant messaging, and e-mails, the photographs taken of the print media or the printouts of those conversations are authenticated, introduced, and received into evidence through the testimony of the recipient of the

messages." (Citations omitted). *Roseberry*, 197 Ohio App.3d 256, 2011-Ohio-5921, 967 N.E.2d 233, at ¶ 75. In *Roseberry*, the court of appeals noted that the state could have properly admitted text messages from the defendant through the victim's testimony, "because she was the recipient of the text messages, had personal knowledge of the content, and could [identify] the sender of the messages." *Id.*

{¶ 22} Assuming for the sake of argument that the text messages to Elhegazy fall within a hearsay exception, Elhegazy had no proof of the identity of the sender of the messages. She attempted to supply this missing information based on an internet application that somehow enabled her to trace the identity of the sender of the message. However, her testimony in this regard would not have been sufficiently reliable.

{¶ 23} In the context of telephone records admitted under the business record exception, authenticity has been satisfied by testimony from telephone company employees who were custodians of the telephone records. *See Blake*, 2012-Ohio-3124, 974 N.E.2d 730, at ¶ 30. For example, in *Blake*, the custodian of records for the telephone company indicated that its records showed the telephone number of the cellular telephone receiving a text, the telephone number of the party sending the text, and the content and arrival time of the text message. *Id.*

{¶ 24} Consistent with these principles, we concluded in *State v. Hirtzinger*, 124 Ohio App.3d 40, 705 N.E.2d 395 (2d Dist.1997), that the trial court erred in admitting evidence as to cell phone records, where the only foundation for the evidence came from one party to the conversation, and not from any employees of the telephone company who could testify about the nature of the company's billing practices. *Id.* at 49-50. We noted that while the witness was not required to have " ' "firsthand knowledge of the transaction," ' " there must be a showing that

the witness was " ' "sufficiently familiar with the operation of the business and with the circumstances of the record's preparation, maintenance and retrieval, that he can reasonably testify on the basis of this knowledge that the record is what it purports to be, and that it was made in the ordinary course of business consistent with the elements of Evid.R. 803(6)." ' " *Id.* at 49, quoting *State v. Vrona*, 47 Ohio App.3d 145, 148, 547 N.E.2d 1189 (9th Dist. 1988), which in turn quotes 1 Weissenberger, *Ohio Evidence*, Section 803.79, at 75-76 (1985).

{¶ 25} Although arguing for admission, Irwin has not cited any authority (nor have we found any), indicating that information regarding the identity of an individual sending a text message should be admitted based on the receiving party's use of an internet program that allegedly tracks cell phone numbers. As we indicated, there may be appropriate methods of admitting this type of information, but Irwin chose not to use them.

{¶ 26} As a final matter, Irwin argues that the trial court's failure to admit evidence relating to text messages was critical, as this evidence cast doubt on the State's case and provided a legitimate basis for the motion to withdraw the plea. In this regard, Irwin relies on our holding in *State v. Tull*, 168 Ohio App.3d 54, 2006-Ohio-3365, 858 N.E.2d 828 (2d Dist.), that "[i]n deciding a presentence motion to withdraw a guilty or no-contest plea, the trial court should consider, in addition to the *Peterseim* factors, whether defendant has a meritorious defense to the charges." *Id.* at ¶ 12, citing *State v. Fish*, 104 Ohio App.3d 236, 240, 661 N.E.2d 788 (1st Dist.1995), and *State v. Peterseim*, 68 Ohio App.2d 211, 428 N.E.2d 863 (8th Dist.1980). According to Irwin, the recantation of a primary witness can provide serious doubt that the offense occurred.

{¶ 27} While this may be true, the record below is devoid of evidence that the alleged

recanting witness was a "primary witness." The witness was not identified, nor did Irwin indicate specifically what the testimony of the witness would be. Furthermore, the facts of this case involve a shooting that caused hospitalization of the victim, meaning that an offense occurred. Six eye-witnesses positively identified Irwin as the shooter, with no hesitation and no doubt as to the identification. Assuming for purposes of argument that the recanting witness is one of the six, this still would not provide serious doubt about the fact that Irwin was the perpetrator.

{¶ 28} In addition to citing a lack of foundation, the trial court also excluded the testimony concerning the text messages allegedly received by Elhegazy on the basis of hearsay. Hearsay statements consist of those, "other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is generally inadmissible. *See, e.g.*, Evid.R. 802. As was noted, text messages have been admitted in situations involving a party opponent, or under the exception for business records in Evid.R. 803(6). *Roseberry*, 197 Ohio App.3d 256, 2011-Ohio-5921, 967 N.E.2d 233 (8th Dist.) (admission of party opponent), and *Blake*, 2012-Ohio-3124, 974 N.E.2d 730 (12th Dist.) (business records exception).

{¶ 29} Irwin argues that two issues at the hearing on the motion to withdraw Irwin's pleas included Irwin's claim of innocence and the timeliness of his motion. We agree that any conversations between Irwin and Elhegazy, concerning her allegedly passing a polygraph examination that related to her receipt of the text messages may have been admissible as to Irwin's state of mind on the timeliness issue. However, neither Irwin's testimony nor the proffer provide a sufficient record for us to determine that the trial court erred. However, as explained

below, even if the trial court erred when it excluded the evidence as to Irwin's state of mind, it was not outcome-determinative.

{¶ 30} Accordingly, we reject Irwin's argument that the trial court erred in refusing to let Irwin's mother testify about the text messages that she allegedly received.

{¶ 31} The second issue under this assignment of error relates to the trial court's refusal to allow testimony about a polygraph examination. Again, the record is devoid of any substantive information about the examination. However, even if additional information had been submitted, Ohio law has long provided that polygraph results are only admissible for purposes of corroboration or impeachment, and only upon stipulation of both sides. *State v. Souel*, 53 Ohio St.2d 123, 372 N.E.2d 1318 (1978), syllabus. Even then, the trial court has discretion to refuse admission of the evidence. *Id. Accord State v. Davis,* 62 Ohio St.3d 326, 341, 581 N.E.2d 1362 (1991), and *State v. Tucker*, 2d Dist. Montgomery No. 22089, 2008-Ohio-2386, ¶ 27.

{¶ 32} In support of his contention that the polygraph results should have been admitted, Irwin argues that we should follow *State v. Sharma*, 143 Ohio Misc.2d 27, 2007-Ohio-5404, 875 N.E.2d 1002 (C.P.), which found polygraph results admissible based on Evid.R. 702 and the test outlined in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

{¶ 33} In its decision, the common pleas court stressed that both *Souel* and *Davis* pre-date *Daubert* and the adoption of amended Evid.R. 702, which was effective in 1994. The common pleas court then concluded that polygraph results would be admissible, stating that:

Upon review, the court finds that in the case at hand, the reliability of the

polygraph tests administered and expertise of the three examiners interpreting the results warrant their admissibility herein.  As it relates to Evid.R. 702(A), little doubt exists that the use of polygraph tests and the interpretation of the test results relate to matters beyond the knowledge or experience possessed by laypersons (or dispels a misconception common among laypersons).  Polygraph tests, just as DNA tests, ballistic tests, fingerprint analysis, and handwriting analysis all are science-related matters beyond the knowledge of a layperson.  To hold otherwise would mean that polygraph results could be admitted without the necessity of putting the examiner on the stand at trial – i.e., with no testimony as to the manner in which the test was performed and the results were interpreted, and without testimony concerning the qualifications of the examiner.

* * *

As it relates to Evid.R. 702(C), the court finds that polygraph testing is reliable as a scientific test and procedure.  Dr. Rovner testified that his doctoral thesis was on the validity of the use of the Utah Zone Comparison Polygraph Test to determine a participant's truthfulness.  This two-year controlled study was presented to the Society for Psycho-physiological Research in 1979 and published in the Journal of Polygraph for the American Polygraph Association.  Based upon this objective study, the overall accuracy for polygraphs was 95.5 percent for the standard noninformational group (no prior knowledge of polygraph testing procedures), 95.5 percent for the informational group (knowledge of polygraph testing procedures), and 71 percent for the informational practice group

(knowledge of polygraph testing procedures and previous experience in taking polygraphs).

* * *

This court notes that the Summit County Prosecutor's Office routinely uses polygraphs as a means to clear defendants after indictment. In fact, one of the top five reasons for the prosecutor's office dismissing an indictment during the year 2004 was because the polygraph or other test result cleared the defendant (Summit County Prosecutor's Newsletter, October 2004). Furthermore, the prosecutor's office has used polygraphs as a means to resolve at least two sexual-offense cases since 2005. Thus the prosecutor's office regularly relies on the test to resolve certain cases. In doing so, the office apparently accepts the validity and reliability of the polygraph test process. Yet, in other cases, perhaps for policy or strategic reasons, the prosecutor's office chooses not to utilize a polygraph test. Such is the situation in the case herein, even when one of the defendant's polygraph examiners is regularly used by the state for testing. Currently, under the holding in *Souel*, the prosecutor's office has the right to refuse to stipulate to a polygraph test. This unfettered discretion gives the prosecutor the ability to pick and choose in which case a polygraph will be utilized. On the other hand, a defendant who wishes to utilize polygraph test results has limited choice and cannot present expert polygraph evidence in his defense unless the state consents.

Given the advancements in polygraph technology since 1978, this court finds that the Sixth Amendment and Fourteenth Amendment warrant the

admission of nonstipulated polygraph evidence in this limited situation in which the trial court has independently found that the proffered polygraph is reliable under Evid.R. 702 and only when the polygraphist is subject to cross-examination and where limited jury instructions are utilized, as required by *Souel*.

*Sharma,* 143 Ohio Misc.2d 27, 2007-Ohio-5404, 875 N.E.2d 1002, at ¶ 31, 37, 45, and 46.

**{¶ 34}** In *State v. Stull*, 9th Dist. Summit No. 27036, 2014-Ohio-1336, the Ninth District Court of Appeals noted that *Sharma* departs from "long standing precedent." *Id.* at ¶ 26. We agree. Until the Ohio Supreme Court holds otherwise, we are bound by the precedent established in *Souel* and *Davis*. We also note that no evidence was presented in the trial court about the polygraph examination. Even if we were able to consider the issue, the record is devoid of any evidence upon which a decision could be made.

**{¶ 35}** The First Assignment of Error is overruled.

### III. Denial of the Motion to Withdraw

**{¶ 36}** Because the Second and Third Assignments of Error are intertwined, we will consider them together. These assignment of error state, respectively, that:

> The Trial Court Erred in Deeming Appellant's Motion to Vacate His Appeal [sic] Untimely.

> The Trial Court Erred in Overturning Appellant's Motion to Vacate His Sentence.

**{¶ 37}** Under these assignments of error, Irwin contends that the trial court erred in denying his motion to vacate his plea. Untimeliness was not a separate reason for denial, but

was one factor that the trial court considered in evaluating the motion to withdraw.

{¶ 38} Crim.R. 32.1 provides that "[a] motion to withdraw a plea of guilty or no contest may be made only before sentence is imposed; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his or her plea." The Supreme Court of Ohio has said that under this rule, " 'motions to withdraw guilty pleas before sentencing are to be freely allowed and treated with liberality * * *.' " *State v. Xie*, 62 Ohio St.3d 521, 526, 584 N.E.2d 715 (1992), quoting from *Peterseim*, 68 Ohio App.2d at 213-214, 428 N.E.2d 863. (Other citation omitted.) Although permission is liberally granted, the decision " 'is within the sound discretion of the trial court,' " and we review the trial court's decision only for abuse of discretion. *Id.*

{¶ 39} We have previously noted that:

Ohio courts often consider nine factors when evaluating a plea-withdrawal motion. * * * They include: "(1) whether the accused is represented by highly competent counsel, (2) whether the accused was given a full Crim.R. 11 hearing before entering the plea, (3) whether a full hearing was held on the motion, (4) whether the trial court gave full and fair consideration to the motion, (5) whether the motion was made within a reasonable time, (6) whether the motion sets out specific reasons for the withdrawal, (7) whether the accused understood the nature of the charges and possible penalties, (8) whether the accused was perhaps not guilty of or had a complete defense to the charge or charges, and (9) whether the state is prejudiced by withdrawal of the plea."

*State v. Patterson*, 2d Dist. Montgomery No. 26015, 2014-Ohio-4962, ¶ 6, quoting *State v.*

*Preston*, 2d Dist. Montgomery No. 25393, 2013-Ohio-4404, ¶ 19.

{¶ 40}    The trial court fully considered these factors, and concluded that they all weighed in favor of denying the motion, other than the factor relating to prejudice to the State. In this regard, the trial court found that the State would not be prejudiced if the motion were granted.

{¶ 41}    On appeal, Irwin focuses on the following contentions: (1) his trial counsel was ineffective because he pressured Irwin to accept the plea, failed to explain the evidence to Irwin, and did not fully investigate Irwin's case; (2) Irwin was crying at his plea hearing because he did not want to take the plea; (3) Irwin was denied a full and fair hearing on his motion to vacate, in view of the trial court's refusal to admit evidence pertaining to text messages and the polygraph examination; (4) Irwin timely filed his request to withdraw his plea; and (5) Irwin read over his discovery packet after he pled guilty, and realized then that "he hadn't done what he was accused of doing."   Appellant's Brief, p. 14.

{¶ 42}    We have already rejected Irwin's contentions about admission of the text messages and polygraph evidence. With respect to trial counsel's effectiveness, the trial court noted that Irwin's counsel was represented by qualified and highly competent counsel whose preparation for trial included going over the discovery packet with Irwin, discussing the strengths and weaknesses of Irwin's case, and advising Irwin that it was in his best interest to accept the plea deal.   The trial court also noted that Irwin's counsel was prepared to go to trial the following week if Irwin did not accept the deal.

{¶ 43}    The trial court's decision is supported by the testimony of Irwin's attorney, who testified at the hearing on the motion to withdraw.   We note that Irwin's testimony conflicts with

his attorney's testimony. However, the trial court specifically found that Irwin's testimony at the withdrawal hearing was not credible. Decision, Order, and Entry Overruling Defendant's Motion to Vacate Guilty Plea, Doc. #144, p. 14.

**{¶ 44}** We have often stressed that "[t]he trial court is in the best position to assess witness credibility." (Citation omitted.) *State v. Thomas*, 2d Dist Greene No. 2006 CA 57, 2007-Ohio-443, ¶ 12. Thus, we give weight to the trial court's conclusions on credibility.

**{¶ 45}** Furthermore, substantial evidence in the record supports the trial court's credibility conclusion. As an initial matter, it is almost beyond belief that a defendant would be in possession of the State's discovery materials for nearly a year before trial, and yet never look at the materials until after he had pled guilty. However, even if one credits this assertion (which shows an incomprehensible lack of attention by a party accused of a serious crime), the fact is that Irwin attended his own preliminary hearing in November 2012, during which the State set forth evidence indicating that probable cause existed to charge Irwin with the crimes.

**{¶ 46}** In addition, Irwin attended the evidentiary hearings on two motions to suppress. During the first suppression hearing, Irwin heard evidence about statements that he, himself, made to the police – and, therefore, knew those statements would be admissible at trial. More importantly, during the second suppression hearing, which was held in July 2013 (approximately six months before the plea), Irwin heard evidence regarding his positive identification by six eye-witnesses – and again, knew this incriminating testimony would be admissible at trial. In view of these facts, Irwin's testimony of having been struck by the inspiration, after his plea, that he could not have committed the crime, lacks credibility.

**{¶ 47}** We also attach little weight to the issue of timeliness of the motion, although we

agree that Irwin could have filed the motion more promptly. Irwin made an oral motion to continue his sentencing hearing on the day of his initial sentencing hearing, and the trial court received his letter asking to vacate the plea the following day. However, the motion to withdraw was not filed until the day of the rescheduled sentencing hearing – which appears to be part of a pattern of delay that occurred throughout Irwin's case.

{¶ 48} Irwin contends that the timeliness of the motion is not an issue, since the motion hearing was not held until almost two months after his plea hearing. This would not excuse any delay in filing. The hearing on the motion was continued to accommodate Irwin's new counsel, who had just entered the case. In any event, as was noted, we attach little weight to the timeliness of filing.

{¶ 49} Finally, the fact that Irwin cried at his plea hearing and may have struggled with whether to take the plea deal does not indicate that he was improperly pressured to do so. The trial court specifically asked Irwin during the plea hearing if he was satisfied with his attorney's representation, and Irwin said that he was satisfied. Transcript of January 9, 2014 Plea Hearing, p. 11. In addition, Irwin told the court that no one had forced him to take the plea. *Id.* at p. 12. Irwin's attorney indicated that it is not uncommon for criminal defendants to struggle over whether to take the State's plea offer. Again, the trial court was entitled to credit the attorney's testimony.

{¶ 50} Having throughly reviewed the record, including the transcripts of the plea hearing and the hearing on the motion to withdraw, we find no error in the trial court's decision. The trial court properly applied the criteria for evaluating whether a defendant should be permitted to withdraw a presentence plea. Accordingly, the Second and Third Assignments of

Error are overruled.

## IV.   Conclusion

{¶ 51}   All of Irwin's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, P.J. and FAIN, J., concur.

Copies mailed to:

Mathias H. Heck
April F. Campbell
Jay B. Carter
Hon. Dennis J. Adkins