[Cite as *State v. Gibson*, 2017-Ohio-877.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2016-06-107 |
| | : | O P I N I O N |
| - vs - | | 3/13/2017 |
| | : | |
| PAUL H. GIBSON, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2015-10-1601

Michael T. Gmoser, Butler County Prosecuting Attorney, Willa Concannon, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Christopher P. Frederick, 300 High Street, Suite 550, Hamilton, Ohio 45011, for defendant-appellant

**PIPER, J.**

{¶ 1} Defendant-appellant, Paul H. Gibson, appeals his conviction in the Butler County Court of Common Pleas for rape.

{¶ 2} On October 28, 2015, the Butler County Grand Jury returned an indictment charging Gibson with four counts of rape in violation of R.C. 2907.02(A)(1)(b), all first-degree felonies. The indictment was later amended to alter the alleged dates of each of the four

counts. The amended indictment alleged violations for the following dates: (1) count one – November 1, 2010 through February 18, 2011, (2) count two – February 19, 2011 through May 31, 2011, (3) count three – May 31, 2011 through August 31, 2011, and (4) count four – May 31, 2011 through February 18, 2012.

{¶ 3} At trial, the state presented the testimony of the victim, A.T., A.T.'s mother, their next door neighbor, Cora Kearns, Dr. Kirsten Simonton, Fairfield Township Police Detective Cory Stebbins, and Middletown Police Detective Steven Winters. Gibson presented the testimony of A.T.'s father, A.T.'s grandmother, Fairfield Township Police Detective Mark Sons, Gibson's brother, and Gibson's estranged wife. The testimony presented at trial revealed the following facts.

{¶ 4} At the time of the offense, A.T. lived with her mother and younger sister in a home in Hamilton, Ohio. On or around August 2011 through November 2011, Gibson and his girlfriend, A.T.'s Aunt, also resided at the home. A.T.'s date of birth is February 19, 2002, and she would have been nine years old during the period that Gibson resided at the Hamilton home. During this period, A.T.'s father was incarcerated and A.T.'s mother often worked throughout the day and into the night; therefore, Gibson and A.T.'s Aunt would often watch the children. A.T. was diagnosed with precocious puberty at age two and epilepsy at age seven. Precocious puberty caused her to develop sexual maturity at an age much earlier than other young girls, including early development of pubic hair and breasts.

{¶ 5} A.T. testified that during the period Gibson resided at the Hamilton residence, Gibson sexually abused her. The events leading up to the sexual abuse began one day when A.T. was getting dressed and Gibson walked into her bedroom and stared at her as she stood naked following a shower, which occurred two or three more times throughout the week. A.T.'s bedroom was disjunctively located in the residence, as one would need to walk down a separate hallway to reach the bedroom. Shortly following the "walk-ins," Gibson

began to enter A.T.'s bedroom after she showered and would touch her breasts and the outside of her vagina. The physical contact progressed into digital vaginal penetration, which A.T. thought, "felt weird." The progression continued overtime; resulting in Gibson forcing A.T. to have vaginal intercourse and to perform fellatio.

{¶ 6} A.T. testified that the first time Gibson forced her to have vaginal intercourse, A.T. returned to her bedroom after a shower and Gibson attempted to kiss her. A.T. smacked Gibson, which Gibson said was disrespectful and angered him. Gibson threw her to the floor, held her down, and put his penis in her vagina making a rocking motion with his body. Thereafter, A.T. testified that the sexual abuse would occur "pretty much every day." The sexual abuse would often occur when her Aunt was not home or outside smoking cigarettes. The next door neighbor, Cora Kearns, testified that she would often see A.T.'s Aunt leave the residence, often stopping at Kearns' home for a ten-to-fifteen-minute "chat." A.T. testified to another specific sexual occurrence near Gibson's March 1 birthday where he forced her to perform fellatio. A.T. described the act as putting her mouth on his penis, and then, something "white" came out of Gibson's penis.

{¶ 7} A.T. testified that the last sexual abuse occurred the day before Gibson and A.T.'s Aunt moved out of the residence, which was near the end of A.T.'s father's incarceration. A.T.'s mother testified that in November 2011 she informed A.T.'s Aunt and Gibson that they were no longer welcome in the house. A.T. recalled that shortly after her mother had informed A.T.'s Aunt and Gibson that they must move out, Gibson entered her bedroom and told her this would be the last time they would see one another every day so they must make it count. Gibson then forced her to perform fellatio and have vaginal intercourse. A.T. described the event as routine because she knew to remove her pants and underwear and that she had to just "lay there and take it."

{¶ 8} A.T. described the sexual abuse as quick occurrences that would happen

- 3 -

almost daily in her bedroom. A.T. testified that during the abuse, her vagina would hurt, and afterwards, it would burn when she urinated. Gibson wore a condom during the first few occurrences, but did not the majority of the time. A.T. felt that she could not communicate the abuse to anyone because Gibson informed her that whomever she told would think that it was A.T.'s fault. A.T. described occasions where Gibson would threaten her and her family if she told anyone of the sexual abuse, and on at least one occasion, had punched and slapped her. Gibson would call A.T. fat and ugly, telling her that she was a "ragdoll" and "nothing" to him or her parents. A.T. testified that she feared Gibson, as well as feared he would abuse her younger sister.

{¶ 9} After a few years of not discussing the abuse with anyone, A.T. eventually discussed it with her mother, a counselor, the police, a caseworker, and pediatric abuse expert, Dr. Simonton. The first discussion began with A.T.'s mother, where A.T. informed her that Gibson had walked into her room once when A.T. was changing. Next, during a therapy session with a counselor, A.T. discussed Gibson walking in on her changing in her bedroom. A.T. testified that she did not share any details of the sexual abuse with her mother or the counselor at this time because she feared her mother would bear the blame due to her extensive work schedule. Eventually, in 2015, A.T. was assigned a caseworker following several hospital trips for depression and anxiety. A.T. disclosed to the caseworker that Gibson would touch her, but "didn't tell her everything." In turn, the caseworker contacted children's services and A.T. met with police, disclosing only that Gibson had touched her. Detective Sons of the Fairfield Township Police was the lead detective for the case.

{¶ 10} Finally, A.T. visited the Mayerson Clinic at Cincinnati Children's Hospital where she met with Dr. Simonton for an interview and genital exam. Dr. Simonton was deemed an expert in her field and testified that in her career she has seen well over a thousand patients for child sexual abuse. During the interview, A.T. first disclosed that Gibson sexually touched

her and forced her to touch him, and then, later disclosed Gibson forced her to have vaginal intercourse. The results of the genital exam were normal, which Dr. Simonton testified was consistent with the sexual abuse described by A.T. Dr. Simonton explained that a normal exam result is the most common finding for abused children. This is especially true when vaginal intercourse occurs years before performance of the exam because vaginal tissue expands and any damage to the vagina may heal rapidly, and often, without any scar tissue. For this reason, the size of an abuser's penis is not relevant in performing a genital exam. Additionally, it is typical for children to take a long time to disclose sexual abuse. Commonly, children will dis0close details of abuse progressively over time as they begin to feel comfortable sharing them, and certain details can often become confusing or difficult to articulate consistently. A.T.'s mother testified that she had likewise been sexually abused as a child; a fact that she shared with A.T.

{¶ 11} Following A.T.'s meeting with police, but before visiting the Mayerson Clinic, Gibson met with Detective Winters of the Middletown Police. After A.T.'s visit to the Mayerson Clinic, Detective Winters met with Gibson a second time. During the first meeting, Detective Winters administered a polygraph examination in regards to the alleged sexual touching. During the second meeting, Detective Winters administered a second polygraph examination in light of the new allegations of sexual intercourse that became known during A.T.'s visit at the Mayerson Clinic. Before trial, the state filed a motion in limine to exclude the polygraph results as well as any mention of the examinations. In response, Gibson requested the trial court preclude Detective Winters from testifying. The trial court preliminarily granted the state's motion and denied Gibson's request. Then, during trial, the court overruled Gibson's objection to the admission of such testimony. In this case, the parties did not stipulate to the admission of the polygraph results; therefore, the trial court limited the scop0e of Detective Winters' testimony to Gibson's statements made during the

pre-test and post-test phases of the examinations.

{¶ 12} Before administering each examination, Detective Winters read Gibson his *Miranda* rights, which Gibson voluntarily waived. Detective Winters testified that Gibson denied the allegations, but did acknowledge that he had once accidentally saw A.T. naked in the doorway of her bedroom. Gibson stated he has held conversations with A.T. while she was wearing a robe. When asked if he had ever touched A.T.'s breasts, Gibson stated, "not that I recall." Additionally, Gibson stated that he was not aware of A.T. ever seeing him naked.

{¶ 13} The final witness to testify for the state was Officer Cory Stebbins. Officer Stebbins was assigned to the case to collect evidence at the residence. At this time, A.T.'s family no longer lived at the Hamilton residence. Officer Stebbins was able to make contact with the current realtor and ascertain that there were other people currently living at the residence. He did not attempt to collect DNA evidence from the home because he learned a fire occurred at the residence and the carpets had been steam cleaned by the current occupants. Therefore, based on his training, Officer Stebbins determined that these events would have degraded any DNA.

{¶ 14} On behalf of the defense, A.T.'s father and A.T.'s grandmother both testified that A.T.'s father was in jail or a halfway house from August 2011 to January 2012. Due to this incarceration, A.T.'s Aunt and Gibson moved into the Hamilton residence from August 2011 to November 2011. Additionally, Detective Sons testified to the development of the allegations, as described above. Initially, A.T. communicated that Gibson had only inappropriately touched her and walked in on her while changing. After A.T.'s visit to the Mayerson Clinic, the allegations progressed to include forced vaginal intercourse. Detective Sons testified that Gibson denied all allegations.

{¶ 15} 0Following deliberations, the jury acquitted Gibson of rape in counts one, two,

and three, but found Gibson guilty of rape as charged in count four of the amended indictment. The trial court sentenced Gibson to serve a term of ten-years-to-life in prison, and classified Gibson as a Tier III sex offender.

{¶ 16} Assignment of Error No. 1:

{¶ 17} THE TRIAL COURT VIOLATED MR. GIBSON'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND [A] FAIR TRIAL WHEN IT OVERRULED HIS MOTION TO EXCLUDE THE TESTIMONY OF DETECTIVE STEVE WINTERS.

{¶ 18} In this case, the trial court granted the state's motion in limine with regard to the polygraph results and denied Gibson's motion to preclude Detective Winters from testifying.

{¶ 19} Gibson argues that Detective Winters' testimony regarding his pre-examination and post-examination statements were a part of the polygraph examinations; therefore, the trial court should have ruled them inadmissible. Gibson contends that the statements were integral to Detective Winters' ability to conduct the polygraph examinations. Therefore, the statements were not placed in the proper context thereby misleading the jury to believe they occurred during the criminal investigation as opposed to being stated during polygraph examinations. Gibson asserts these statements placed him at a disadvantage at trial because he was unable to explain the voluntary statements occurred during two polygraph examinations. Thus, the trial court erred to Gibson's prejudice when it admitted his statements made to Detective Winters, and then, prohibited him from presenting contextual evidence explaining they occurred during polygraph examinations.

{¶ 20} "A motion in limine * * * is 'a tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of [an] evidentiary issue.'" *State v. Harris*, 12th Dist. Butler No. CA2007-11-280, 2008-Ohio-4504, ¶ 27, quoting *State v. Grubb*, 28 Ohio

St.3d 199, 201-02 (1986). "A motion in limine is directed to the inherent discretion of the trial judge, about an evidentiary issue that is anticipated, but has not yet been presented in full context." (Citation omitted.) *Harris* at ¶ 27. A complaining party properly preserves asserted error from a trial court's anticipatory order in limine when such party raises the evidentiary issue by timely objecting on the record at the place in the trial that the foundation and context for admissibility has been developed. *State v. Johnson*, 12th Dist. Butler No. CA86-04-060, 1987 Ohio App. LEXIS 7714, *8 (June 29, 1987), citing Evid.R. 103(A).

{¶ 21} When presented at trial, Gibson timely objected to the admission of the evidence; therefore, he properly preserved the alleged error for appellate review. Thus, we are not reviewing the trial court's decision to overrule Gibson's motion to preclude Detective Winters from testifying. Rather, we are reviewing the trial court's decision to overrule Gibson's objection at trial to the admission of the evidence. *See, e.g.*, *State v. Moon*, 4th Dist. Adams No. 08CA875, 2009-Ohio-4830, ¶ 29. The admissibility of polygraph results is within a trial court's discretion. *State v. Souel*, 53 Ohio St.2d 123 (1978), paragraph two of the syllabus. An abuse of discretion is more than an error of law or judgment. Rather, it suggests the "trial court's decision was unreasonable, arbitrary or unconscionable." *State v. Perkins*, 12th Dist. Clinton No. CA2005-01-002, 2005-Ohio-6557, ¶ 8. "A review under the abuse-of-discretion standard is a deferential review." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14.

{¶ 22} Detective Winters did not testify regarding any statements made during the examinations, nor did the trial court permit any mention that two polygraph examinations were administered. The questioning was presented in the context of two separate interviews where Gibson was afforded his *Miranda* rights, which he voluntarily waived. The issue is not whether Gibson's statements were knowing, intelligent, and voluntary. Rather, the issue Gibson presents is whether his statements before and after the administration of the

polygraph examinations were admissible within the framework of *Souel*. If we find the statements were admissible within the framework of *Souel*, there is the additional issue of whether Gibson should have been afforded an opportunity to elicit testimony regarding the context of the statements for the jury.

{¶ 23} in the syllabus of *Souel*, the Ohio Supreme Court outlined the requisite conditions for the admission of the *results* of a polygraph examination:

> The results of a polygraphic examination are admissible in evidence in a criminal trial for purposes of corroboration or impeachment, provided that the following conditions are observed:
>
> (1) The prosecuting attorney, defendant and his counsel must sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.
>
> (2) Notwithstanding the stipulation, the admissibility of the test results is subject to the discretion of the trial judge, and if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.
>
> (3) If the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:
>
> (a) the examiner's qualifications and training;
>
> (b) the conditions under which the test was administered;
>
> (c) the limitations of and possibilities for error in the technique of polygraphic interrogation; and,
>
> (d) at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.
>
> (4) If such evidence is admitted the trial judge should instruct the jury to the effect that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged, and that it is for the jurors to determine what weight and effect such testimony should be given.

- 9 -

{¶ 24}   A polygraph examination "consists of three separate phases: the pre-test, the testing phase and the post-test." *State v. Ferris*, 12th Dist. Warren No. CA88-05-042, 1989 Ohio App. LEXIS 195, *3 (Jan. 17, 1989).   The pre-test phase consists of the examiner reading the examinee his constitutional rights and asking background information.   *Id.* "During the testing phase, the examinee is hooked up to the machine while being questioned in order to determine whether or not he is telling the truth."   *Id.*   The post-test phase immediately follows the testing phase and provides the examinee "an opportunity to offer any additional information concerning his particular test, and to state anything else that the examiner should be aware of, or any problems he had during the testing."   *Id.*

{¶ 25}   The parameters set out in *Souel* are inapplicable when the polygraph examiner testifies at trial without discussing polygraph results.   *State v. Azbell*, 5th Dist. Fairfield No. 04CA11, 2005-Ohio-1704, ¶ 198-200 (holding trial court did not abuse its discretion by permitting examiner to testify as to defendant's statements made during the course of a polygraph examination without any mention of the examination or the results therefrom), citing *State v. Spirko*, 59 Ohio St.3d 1, 6 (1991); *see also State v. Smith*, 715 P.2d 1301, 1310 (Mont.1986) (differentiating between test results and statements, as test results involve the examiner's evaluation of responses, while statements involve direct responses to questioning and not any credibility evaluations or impressions), citing *Bashor v. Risley*, 730 F.2d 1228, 1238 (9th Cir.1984).

{¶ 26}   Consistent with the Fifth District's holding during the testing phase, the United States Supreme Court has held that statements during a "post-test interrogation" were admissible because the defendant had been properly *Mirandized* and voluntarily, knowingly, and intelligently waived his rights prior to the polygraph examination.   *Wyrick v. Fields*, 459 U.S. 42, 48, 103 S.Ct. 394 (1982) (stating "[a]lthough the results of the polygraph examination might not have been admissible evidence, the statements [the defendant] made

in response to questioning during the course of the polygraph examination surely would have been"). Likewise, the Ohio Supreme Court and this court have found that confessions made during "pre-test" and "post-test" interviews were admissible where the defendant was properly *Mirandized* and voluntarily, knowingly, and intelligently waived his rights prior to the polygraph examination. *See, e.g., State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, ¶ 55-66; *State v. Liso*, 12th Dist. Brown No. CA2012-08-017, 2013-Ohio-4759, ¶ 10-18; *State v. Menke*, 12th Dist. Butler No. CA2002-01-021, 2003-Ohio-77, ¶ 13-15.

{¶ 27} In this case, there is no dispute Gibson was properly *Mirandized* and that he voluntarily, knowingly, and intelligently waived his rights prior to each polygraph examination. Moreover, Detective Winters did not testify about the results of the polygraph examinations or even mention he administered the examinations. Therefore, *Souel* does not apply and Detective Winters' testimony regarding statements made by Gibson during the pre-examinations and post-examinations was admissible at trial. Accordingly, the trial court did not abuse its discretion by permitting the state to elicit such testimony.

{¶ 28} Next, Gibson argues if Detective Winters' testimony was admissible, then the trial court erred by not permitting Gibson to elicit testimony that his statements were provided in the course of two polygraph examinations. However, the mere mention that a witness or defendant has taken a polygraph – regardless of whether the results thereof were disclosed – is prejudicial error justifying a trial court to declare a mistrial. *State v. Raypole*, 12th Dist. Fayette No. 80-CA-6, 1981 Ohio App. LEXIS 14286, *3-4 (June 26, 1981), citing *State v. Smith*, 113 Ohio App. 461, 461 (6th Dist.1960). Quite naturally, once a jury hears a polygraph examination was given, the jury will speculate as to why the results were not provided. When the results are not admitted, the probative value of hearing a polygraph examination was conducted is substantially outweighed by the prejudicial effect of the jury's speculation. *See* Evid.R. 403.

{¶ 29} Moreover, "[i]t is axiomatic that the results of a polygraph examination are not admissible unless the parties stipulate in writing to the admission of the results." *State v. Hamon*, 5th Dist. Delaware No. 12 CAA 12 0089, 2015-Ohio-887, ¶ 19, citing *Souel*, 53 Ohio St.2d at 126. The parties did not stipulate in writing to the admission of the results of Gibson's polygraph examinations. Therefore, the trial court properly prohibited the parties from mentioning the fact that Gibson had taken two polygraph examinations. We agree with Gibson's contention that cross-examination of the state's witnesses is an important right of a criminal defendant. Nevertheless, the extent of cross-examination is controlled by the relevant law, and left to the sound discretion of the trial judge. *Raypole* at *2. Based on the foregoing, we find the trial court did not abuse its discretion by prohibiting any mention of the polygraph examinations.

{¶ 30} Accordingly, Gibson's first assignment of error is overruled.

{¶ 31} Assignment of Error No. 2:

{¶ 32} MR. GIBSON'S CONVICTION[ WAS] AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 33} Gibson was convicted of one count of rape in violation of R.C. 2907.02(A)(1)(b), which provides that an individual is guilty of rape where he or she "engage[s] in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex[,]" and includes the unprivileged "insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

{¶ 34} Gibson contends that his conviction for rape is against the manifest weight of

the evidence because the only evidence presented at trial to support his conviction was A.T.'s testimony. Gibson asserts A.T.'s story of what occurred at the Hamilton residence was inconsistent; therefore, the jury lost its way in executing its responsibilities as the factfinder and weigher of credibility. In support of this argument, Gibson points to the progressive development of A.T.'s story from Gibson walking in on her while changing to daily forcible sexual intercourse. Gibson argues that A.T. distinctly recalled Gibson forcing her to engage in sexual intercourse on his March 1 birthday, which contradicts other evidence presented because Gibson did not live at the Hamilton residence at that time.

{¶ 35} Gibson further attacks A.T.'s credibility referring to her developing story as "illogical." In addition to the assertions above, Gibson argues that had he forced sexual conduct with A.T. every day for three months, someone would have noticed based on the size of the house, A.T.'s testimony that she yelled for help, and any other possible physical signs of abuse, such as bruising. Furthermore, A.T.'s story is further negated by the normal results of her physical exam years later and the fact that A.T.'s mother had communicated to A.T. that she was also sexually abused as a child. Finally, Gibson argues that his acquittal on the first three counts does not comport with his conviction on the final count.

{¶ 36} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. In making this determination, a reviewing court looks at the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34.

{¶ 37} "While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, these issues are primarily matters for the trier of fact to decide." (Citation omitted.) *State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶ 81. Therefore, "[a]n appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal." *State v. Couch*, 12th Dist. Butler No. CA2016-03-062, 2016-Ohio-8452, ¶ 8.

{¶ 38} After a thorough review of the record, we find that Gibson's conviction for raping A.T. in count four was not against the manifest of the evidence. The testimony presented revealed that Gibson resided at the Hamilton residence from approximately August 2011 through November 2011. The fourth count in the amended indictment, on which the jury convicted Gibson, alleged rape from May 31, 2011 through February 18, 2012. Therefore, there was evidence demonstrating Gibson lived at the Hamilton residence during the alleged timeframe, when A.T. was younger than thirteen years old. At trial, A.T. testified that Gibson forced her to have vaginal intercourse and fellatio on a daily basis while Gibson lived at the residence. A.T. specifically recalled the final rape occurred during the period when her father was incarcerated. She testified that it occurred following a confrontation between her mother and A.T.'s Aunt. A.T. distinctly remembered Gibson explaining that this would be the last time, so he wanted to make it count. Then, Gibson forced her to have vaginal intercourse and to perform fellatio. A.T.'s mother corroborated the confrontation and explained that in November 2011, she informed A.T.'s Aunt and Gibson that they were no longer welcome at the residence. Shortly after the final rape, Gibson moved out and A.T.'s father returned to the Hamilton residence.

{¶ 39} The jury found A.T.'s testimony believable and we defer to the factfinder with respect to credibility determinations. Any asserted inconsistencies in A.T.'s recollection of

what occurred during the fall of 2011 are readily explained by Dr. Simonton's testimony. Dr. Simonton, an expert in pediatric abuse who has seen over a thousand patients for child sexual abuse in her career, testified that it is common for abused children to progressively disclose details of the abuse over time as they begin to feel more comfortable sharing them. Moreover, Dr. Simonton also explained that details can often become confusing or difficult to articulate consistently. Here, over time, A.T. disclosed further details of the sexual abuse until she began to feel more comfortable. Slight factual distinctions, such as whether the sexual abuse always occurred following a shower or when Gibson may have worn a condom over a three-month period – as Dr. Simonton explained – can become confusing or difficult to articulate consistently. The length of time it took A.T. to communicate the sexual abuse was not unusual especially given Gibson's threats of harm to A.T. and her family. Nor is it unreasonable that the daily sexual abuse went unnoticed at the time. The only other people residing at the home were A.T.'s Aunt, A.T.'s mother, and A.T.'s younger sister, and there was evidence presented demonstrating the abuse occurred when A.T.'s mother was at work and A.T.'s Aunt was often out of the house.

{¶ 40} Additionally, contrary to Gibson's claim otherwise, A.T.'s normal result on her genital examination is not inconsistent with her testimony. Dr. Simonton explained that a normal result is not only the most common result, but it is also *consistent* with the sexual abuse described by A.T. because vaginal tissue expands and any damage to the vagina may heal rapidly, and often, without any scar tissue. For this reason, the size of Gibson's penis is irrelevant to the outcome of the genital examination. Moreover, to the extent any inconsistencies existed, the jury was able to rationally resolve them based on the testimony presented at trial during their deliberations.

{¶ 41} The verdicts reached by the jury demonstrate this point, as the dates alleged in counts one, two, and three, were provided less support by the evidence. The evidence

presented an approximate time when A.T.'s Aunt and Gibson lived at the Hamilton residence. The only count of rape that fit this period – in light of the other testimony regarding the sexual abuse – was count four. Accordingly, the jury's finding of not guilty on counts one, two, and three, and guilty on count four are not inconsistent with one another. Nonetheless, "[c]hild victims are not expected to remember the exact dates of when psychologically traumatic abuse occurred, especially when abuse is spread over an extended period of time." *State v. Marcum*, 12th Dist. Preble No. CA2015-04-011, 2016-Ohio-263, ¶ 11. Additionally, charges involving sexual conduct or sexual contact may be proven solely by witness testimony. *Id.* Therefore, we do not find that the jury clearly lost its way or created such a manifest miscarriage of justice that Gibson's conviction must be reversed. Consequently, Gibson's second assignment of error is overruled.

{¶ 42}  Judgment affirmed.

HENDRICKSON, P.J., and RINGLAND, J., concur.